# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **NANCY WORLEY**, *et al.*, )<br><br>**Plaintiffs,** )<br><br>v. )<br><br>**ISLAMIC REPUBLIC OF IRAN**, *et al.*, )<br><br>**Defendants.** ) | Civil Action No. 12-2069 (RCL) |

## MEMORANDUM OPINION

This is one of many cases to have come before this Court arising out of the October 1983 bombing of the U.S. Marine barracks in Beirut, Lebanon.  Plaintiffs—servicemen, relatives of servicemen, and estates representing deceased members of these groups—seek to recover damages for injuries sustained in the attack and its aftermath from defendants the Islamic Republic of Iran and the Iranian Ministry of Information and Security ("MOIS").

Pending before the Court are plaintiffs' motion for default judgment on liability and their motions to appoint special masters.  For the reasons that follow, the Court concludes that defendants are liable to plaintiffs for injuries arising out of the Beirut barracks bombing.  Therefore, plaintiffs' motion for default judgment on liability is **DENIED IN PART** as to plaintiffs Ollie James Edwards and Jeff Dadich and **GRANTED IN PART** as to all other plaintiffs.  The Court also concludes that Alan Balaran shall be appointed special master of the Court for consideration of the measure of damages appropriate for each plaintiff and for completion of such other duties as are specified in the Court's Order accompanying this

Memorandum Opinion and also issued this date.  Plaintiffs' motion to appoint Mr. Balaran is **GRANTED**.  Plaintiffs' other motions to appoint special masters are **DENIED**.

## I.  PROCEDURAL HISTORY

Plaintiffs filed suit on December 28, 2012.  Compl., ECF No. 1.  Both jurisdiction and liability are premised on section 1605A of the Foreign Sovereign Immunities Act ("FSIA").  28 U.S.C. § 1605A.  That section, often referred to as the state-sponsored terrorism exception to foreign sovereign immunity, furnishes a private right of action to victims of state-sponsored terrorism who meet the statute's strict requirements.

Defendants were served with process on July 31, 2013, notifying them of the pendency of this litigation.  ECF No. 17.  Defendants did not appear or respond in any way.  They have not done so to this day.  The Clerk of the Court, upon an affidavit by plaintiffs in support thereof, entered default against defendants on May 23, 2014.  ECF Nos. 20, 21.  Plaintiffs have since moved for a default judgment against defendants.  Pl.'s Renewed Mot. for Default J. on Liability, ECF No. 27.  They have also moved for appointment of three special masters: Larry Searle Lapidis, Alan Balaran, and Ronald Hedges.  Pl.'s Mot. to Appoint Special Master, ECF Nos. 23– 27.

## II.  FINDINGS OF FACT

Before determining whether defendants should have a default judgment entered against them, the Court must consider evidence and make findings of fact with respect to plaintiffs' allegations.  This is because section 1608(e) of the FSIA requires that no default judgment shall be entered against a foreign state or its political subdivision except upon "evidence satisfactory to the court."  28 U.S.C. § 1608(e).  The Court, therefore, may not "simply accept a complaint's unsupported allegations as true."  *Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 171

(D.D.C. 2010).   Courts may rely upon uncontroverted factual allegations that are supported by affidavits.  *Id.*  Also, courts may take judicial notice of prior related proceedings in cases before the same court.  *Id.*  Before the Court sets out its findings of fact, the basis for accepting this latter form of evidence warrants greater elaboration.

### A.  Judicial Notice of Prior, Related FSIA Cases

A court may "take judicial notice of, and give effect to, its own records in another but interrelated proceeding."  *Opati v. Republic of Sudan*, ---F. Supp. 2d---, Civil Action No. 12-1224 (JDB), 2014 WL 3687125, at *2 (D.D.C. July 25, 2014) (quoting *Booth v. Fletcher*, 101 F.2d 676, 679 n.2 (D.C. Cir. 1938)).  This is in keeping with Federal Rule of Evidence 201(b), which allows a court to "judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b).  In light of this authority and the numerous FSIA cases in recent years giving rise to nearly identical factual and legal issues, this Court and others in this District have frequently taken judicial notice of earlier, related cases arising under the state sponsored terrorism exception to foreign sovereign immunity.  *See, e.g.*, *Fain v. Islamic Republic of Iran*, 856 F. Supp. 2d 109, 115 (D.D.C. 2012) (citing cases).

The Court may not, however, simply adopt previous factual findings without scrutiny.  This is because factual findings "represent merely a court's probabilistic determination as to what happened, rather than a first-hand account of the actual events."  *Id.* at 116.  As such, courts have concluded that findings of fact are generally considered hearsay, not subject to an enumerated exception to the prohibition on hearsay evidence in the federal rules.  *Rimkus*, 750 F. Supp. 2d at 172.  This does not mean, however, that courts in later, related FSIA proceedings are given the "onerous burden of re-litigating key facts in related cases arising out of the same

terrorist attack." *Id.* Instead, courts hearing related FSIA cases may "rely upon the evidence presented in earlier litigation—without necessitating the formality of having that evidence reproduced—to reach their own, independent findings of fact in the cases before them." *Id.* As stated above, the records of this Court in related proceedings are not subject to reasonable dispute. *See Opati*, 2014 WL 3687125, at *2. Thus, the type and substance of evidence previously presented to this Court in prior proceedings may be judicially noticed in the process of reaching findings of fact in this case.

In *Peterson v. Islamic Republic of Iran*, 264 F. Supp. 2d 46 (D.D.C. 2003), this Court presided over a two day bench trial of claims arising out of the Beirut barracks bombing. *Id.* at 48. The Court "reviewed the extensive evidence presented during that trial by both lay and expert witnesses" regarding the bombing and defendants' actions relating to it. *Id.* The Court will take judicial notice of that evidence in making its findings of fact in this case.

## B.  The United States Presence in Beirut

The 24th Marine Amphibious Unit ("the 24th MAU") of the United States Marines arrived in Beirut in 1983 as part of a multinational peacekeeping force comprised of American, British, French, and Italian soldiers. *Id.* at 49. Their presence was in response to an ongoing civil war in Lebanon, one that would kill approximately twenty thousand Lebanese before its conclusion. *Id.* Col. Timothy Geraghty, commander of the 24th MAU, testified before the Court in *Peterson* regarding their mission:

> [E]ssentially what it was, it was primarily a peacekeeping mission and it was to show [our] presence, and when I say ours, and this is throughout all the forces, is that we were out showing a presence, [primarily] to provide stability to the area. And I might add that there's no doubt in just about anyone involved at the time, we saved a lot of lives by our presence there for awhile.  And that was part of, I might add, in my judgment, the success of that, our presence mission there, and [that] it was working is the primary reason why we were targeted . . . .

4

> The rules—these were geared primarily again with the peacekeeping mission [in mind] and the sensitivities of killing or maiming someone accidentally.   That could be a tinderbox.   That could start a whole chain of events.

*Id.* at 50 (alterations in original).

The "rules" referred to in Col. Geraghty's testimony, the rules of engagement applicable to the 24th MAU, "made clear that the servicemen possessed neither combatant nor police powers."   *See id.* at 49 (finding that the "servicemen were ordered not to carry weapons with live rounds in their chambers, and were not authorized to chamber the rounds in their weapons unless (1) they were directly ordered to do so by a commissioned officer or (2) they found themselves in a situation requiring the immediate use of deadly force in self-defense").   In light of this evidence, the Court finds, just as it did in *Peterson*, "that on October 23, 1983, the members of the 24th MAU, and the service members supporting the unit, were clearly non-combatants operating under peacetime rules of engagement."   *Id.* at 50.

### C.  The Bombing

On the morning of October 23, 1983, an Iranian national named Ismalal Ascari crashed a truck containing a large explosive device through wire and sandbag barriers and into the center of the 24th MAU's barracks.   *Id.* at 56.   The truck's payload detonated with a force between 15,000 and 21,000 pounds of TNT, destroying the four story barracks building and leaving a crater over eight feet deep.   *Id.*   241 servicemen died in the blast.   *Id.* at 58.   Many others were wounded.   *Id.*

The attack resulted from a plan hatched by a group including the leader of the Lebanese headquarters of the Iranian Revolutionary Guard, an elite Iranian security and military force, and leaders of Hezbollah, a radical organization dedicated to the perpetration of "terrorist activities in furtherance of the transformation of Lebanon into an Islamic theocracy modeled after Iran."   *Id.*

at 51, 54 n.14, 55–56.  The truck used to carry out the attack was "disguised so that it would resemble a water delivery truck that routinely arrived at the Beirut International Airport, which was located near the U.S. Marine barracks in Beirut."  *Id.* at 56.  Members of Hezbollah "ambushed the real water delivery truck before it arrived at the barracks," allowing the bomb carrying truck to carry on its mission without raising suspicion until it was too late.  *See id.*

### D.  Defendants' Actions and Involvement

The *Peterson* Court received overwhelming evidence demonstrating that "Hezbollah and its agents received massive material and technical support from the Iranian government" in carrying out the Beirut attack and that the "formation and emergence of Hezbollah as a major terrorist organization is due to the government of Iran."  *Id.* at 53, 58.  The Court agrees that these findings are accurate and adopts them in this case.  These findings are demonstrated by the following evidence.

### 1.  Iran's role in Hezbollah's origins and operations

Hezbollah first began as a radical faction of Shi'ite Muslims in Lebanon, encouraged in 1982 to separate from more moderate members of the community by the Iranian government.  *Id.* at 51.  Experts testified to the *Peterson* Court that at the time of the Beirut bombing, Hezbollah was largely a "creature of the Iranian government," wholly dependent on the government's financial support and largely acting in furtherance of Iranian interests.  *Id.* at 51–53; *e.g. id.* at 53 (recounting testimony stating that the internal politics of Hezbollah were such that "no one in the organization would have thought about carrying out an activity without Iranian approval and almost certainly Iranian orders").  Indeed, Robert Baer, a case officer in the Directorate of Operations at the CIA at the time, testified to the Court that "Hezbollah wasn't 'formally' created until 1985;" before that date, it was merely "a bunch of agents of Iran."  *Id.* at 52 n.10.

### 2.  MOIS approval and instigation of the Beirut attack

MOIS was at the center of the relationship between Iran and Hezbollah.  Originally formed as the secret police of the Shah of Iran, MOIS served as the "intelligence organization of the new government" after the 1979 revolution.  *Id.* at 53.  It was also the "primary agency through which the Iranian government both established and exercised operational control over Hezbollah."  *Id.*  Testimony at the *Peterson* trial established that MOIS approval would have been required before an operation like the Beirut attack.  *Id.*

Such a message of approval did, in fact, issue regarding the barracks bombing.  Admiral James A. Lyons, Deputy Chief of Naval Operations for Plans, Policy, and Operation at the time testified regarding the interception of a September 26, 1983 message between Tehran and Damascus.  *Id.* at 54.  The Court in *Peterson* described the message:

> The message had been sent from MOIS to the Iranian ambassador to Syria, Ali Akbar Mohtashemi, who presently serves as an adviser to the president of Iran, Mohammad Khatami.  The message directed the Iranian ambassador to contact Hussein Musawi, the leader of the terrorist group Islamic Amal, and to instruct him to have his group instigate attacks against the multinational coalition in Lebanon, and "to take a spectacular action against the United States Marines."  Admiral Lyons testified that he has absolutely no doubt of the authenticity or reliability of the message, which he took immediately to the secretary of the navy and chief of naval operations, who viewed it, as he did, as a "24–karat gold document."

*Id.* at 54 (footnotes omitted).   Evidence presented to the Court showed that Ambassador Mohtashemi "did proceed to contact a member of the Iranian Revolutionary Guard . . . and instructed him to instigate the Marine barracks bombing."  *Id.* at 54–55 (describing deposition testimony of a Hezbollah member who stated that Mohtashemi contacted the leader of the Lebanese headquarters of the Iranian Revolutionary Guard, the man who went on to help plan the attack with members of Hezbollah, as set forth above).

### 3.  Iranian material support for Hezbollah and the Beirut attack

Between 1983 and 1988, "the government of Iran spent approximately $50 to $150 million financing terrorist organizations in the Near East." *Id.* at 51. Hezbollah was one entity to receive the benefit of Iran's sinister largesse. MOIS acted as a "conduit" for the provision of these funds to Hezbollah. *Id.* at 53.

Iran's support extended to the provision of training and matériel. Dr. Reuven Paz, a scholar who had conducted extensive research on Islamist terrorist organizations, testified to the *Peterson* Court that during the creation of Hezbollah, members "started to be trained in training camps in the Bekaa Valley, where the main Iranian forces were located." *Id.* at 52. As to the supplies used in carrying out the barracks bombing, circumstantial evidence strongly indicates Iranian involvement. The bomb that caused the blast was composed of a large quantity of an explosive called pentaerythritol tetranitrate ("PETN"), according to testimony from on-scene FBI forensic explosive investigator Danny A. Defenbaugh. *Id.* at 56–57. The PETN on board the truck was in "bulk form," meaning that it was of a raw type not generally available commercially. *Id.* at 56–57. Evidence indicated that "[i]n the Middle East, the bulk form of PETN is produced by state-sponsored manufacturers for military purposes." *Id.* at 57. Warren Parker, an explosives expert testifying before the *Peterson* Court, stated that the bombing could not have been carried out by a mere group of unsophisticated individuals because of the "significant amount" of "military-type explosive" involved and because "it was carried out so successfully and not bungled;" the latter point "enhance[d] the fact that somebody had practiced this before." *Id.* at 57–58.

In light of this evidence, the Court reaffirms its previous finding that the "sophistication demonstrated in the placement of an explosive charge in the center of the Marine barracks building and the devastating effect of the detonation of the charge indicates that it is highly

unlikely that this attack could have resulted in such loss of life without the assistance of regular military forces, such as those of Iran." *Id.* at 58.

### 4. Iranian government involvement at the highest level

As set forth above, major Hezbollah operations at the time of the barracks bombing would have required Iranian approval. Indeed, an intercepted message from MOIS to the Iranian ambassador in Syria appears to have instigated and approved the Beirut attack. Dr. Patrick Clawson, an Iranian affairs expert, testified that this MOIS approval would have come after a "discussion in the National Security Council which would involve the prime minister, and it would also have required the approval of Iran's supreme religious leader, Ayatollah Khomeini." *Id.* at 53 (basing this view on "detailed accounts about the approval process from other attacks at this time"). Given this testimony, the Court finds that "MOIS was no rogue agency acting outside of the control and authority of the Iranian government." *Id.* Furthermore, the necessity of the approval of the ayatollah and the prime minister demonstrates that any MOIS act during this period supporting Hezbollah and the barracks bombing specifically is properly deemed an act of Iran's government. *Id.* at 54.

## III. CONCLUSIONS OF LAW

### A. Jurisdiction and Sovereign Immunity

The FSIA is the "sole basis for obtaining jurisdiction over a foreign state in our courts." *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989). The statute codifies the concept of foreign sovereign immunity, something which is "a matter of grace and comity on the part of the United States, and not a restriction imposed by the Constitution." *Republic of Argentina v. NML Capital, Ltd.*, 134 S. Ct. 2250, 2255 (2014) (quoting *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 486 (1983)). The FSIA sets forth exceptions to

foreign sovereign immunity that provide the only authority for a district court to assert subject matter jurisdiction over claims against a foreign state. *Odhiambo v. Republic of Kenya*, 764 F.3d 31, 34 (D.C. Cir. 2014). "[I]f no exception applies, the district court has no jurisdiction." *Id.*

Because subject matter jurisdiction is premised on the existence of an exception to foreign sovereign immunity, a district court considering a claim against a foreign state must decide whether an exception to immunity applies "even if the foreign state does not enter an appearance to assert an immunity defense." *Verlinden*, 461 U.S. at 493 n.20. This is in keeping with the general rule that "[s]ubject-matter jurisdiction can never be waived or forfeited;" thus, when jurisdictional questions arise in a suit, "courts are obligated to consider *sua sponte* issues that the parties have disclaimed or have not presented." *Gonzalez v. Thaler*, 132 S. Ct. 641, 648 (2012).

### 1. Original jurisdiction

Federal district courts have original jurisdiction over FSIA cases by virtue of 28 U.S.C. § 1330. It provides that original jurisdiction will exist over (1) nonjury civil actions (2) for claims seeking relief *in personam* (3) against a foreign state (4) when the foreign state is not entitled to immunity either under sections 1605-1607 of the FSIA or under any applicable international agreement. 28 U.S.C. § 1330(a). Section 1604 of the FSIA reinforces element four, stating that foreign states are presumptively immune from jurisdiction in federal and state courts except to the extent provided in sections 1605 to 1607. 28 U.S.C. § 1604.

All of section 1330(a)'s requirements are met in this case. First, plaintiffs have not demanded a jury trial. This is, therefore, a nonjury civil action. Second, this suit is against defendants as legal persons, not against property. The claims, therefore, seek relief *in personam*. *Cf. Gang Luan v. United States*, 722 F.3d 388, 399 n.15 (D.C. Cir. 2013) ("*In personam*

jurisdiction is jurisdiction over the defendant. *In rem* jurisdiction is jurisdiction over the property.").

Third, this suit is against a "foreign state." One defendant, Iran, is plainly a foreign state. The status of MOIS requires greater consideration. The FSIA defines a foreign state at section 1603(a) as including "a political subdivision of a foreign state." 28 U.S.C. § 1603(a). The D.C. Circuit has adopted a "categorical approach" to determining the legal status of foreign government-related entities for purposes of the FSIA's jurisdiction and service of process provisions: "if the core functions of the entity are governmental, it is considered the foreign state itself; if commercial, the entity is an agency or instrumentality of the foreign state." *Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 234 (D.C. Cir. 2003). Evidence presented to the Court in *Peterson* demonstrated that MOIS operated as the "intelligence organization" of Iran at the time of the attack. *Peterson*, 264 F. Supp. 2d at 53. Intelligence gathering and operations are not commercial in nature; they are governmental functions. MOIS, thus, may be treated as itself the "foreign state" for purposes of section 1603(a). *See Oveissi v. Islamic Republic of Iran*, 879 F. Supp. 2d 44, 51 (D.D.C. 2012) (finding that MOIS was a foreign state for purposes of those proceedings because the evidence established it was a "division of the state" itself).

### a. Sovereign immunity

The final requirement for jurisdiction under section 1330(a), whether an exception to sovereign immunity exists as to the defendants, requires more substantial explanation. The exception to foreign sovereign immunity relevant to this suit is codified at 28 U.S.C. § 1605A, the state-sponsored terrorism exception. 28 U.S.C. § 1605A. That section establishes that a foreign state has no immunity

> [I]n any case . . . [1] in which money damages are sought [2] against a foreign state [3] for personal injury or death that was [4] caused by [5] an act of torture,

extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act if such act or provision of material support or resources is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.

*Id.* (numbering added).   The Court now considers each of these requirements for waiver of sovereign immunity in turn.

First, the complaint identifies and seeks only monetary remedies for plaintiffs' alleged injuries.   *See generally* Compl.   Second, as established above, both defendants are foreign states as defined by the statute.   Third, plaintiffs have alleged various instances of personal injury or death and all claims arise from these allegations.   Under section 1605A, such injury or death "must merely be the bases of a claim for which money damages are sought."   *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 66 (D.D.C. 2010).   Jurisdiction is not restricted to injury suffered directly by each claimant.   *Id.*   Thus, plaintiffs' various claims for physical, emotional, and financial damages to survivors, decedent's estates, and decedent's family members, all arising from the bombing, constitute the type of claims for personal injury or death required for jurisdiction.

The fourth element, causation, is established by showing "some reasonable connection between the act or omission of the defendant and the damages which the plaintiff has suffered." *Id.* (internal citation omitted).   Plaintiffs need not show that their injuries would not have occurred "but for" defendants' actions.   *See Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1128 (D.C. Cir. 2004) (interpreting the similarly worded causation requirement of the former state-sponsored terrorism exception to foreign sovereign immunity, section 1605(a)(7), as requiring only "proximate cause").   Plaintiffs have sufficiently demonstrated a "reasonable connection" between defendants' acts and their damages.   Iran, through its political subdivision MOIS, provided funding, equipment, and training to Hezbollah,

thereby assisting it in carrying out the barracks bombing.  Furthermore, MOIS, with the approval

of the Iranian regime, approved and instigated the attack.  Evidence shows that Hezbollah

received and acted upon this message.  These facts more than demonstrate the kind of reasonable

connection required for a waiver of foreign sovereign immunity under section 1605A of the

FSIA.  *Cf. Estate of Doe v. Islamic Republic of Iran*, 808 F. Supp. 2d 1, 16 (D.D.C. 2011)

(holding, with respect to the 1983 and 1984 attacks on the United States embassy in Beirut, that

Iran's support for Hezbollah made it "entirely foreseeable that innocent people would be killed

or injured by the detonation of a van filled with explosives").

Finally, the claims must arise out of "an act of torture, extrajudicial killing, aircraft

sabotage, hostage taking, or the provision of material support or resources for such an act."  This

act or provision of material support must be engaged in by an officer, employee, or agent of the

foreign state within the scope of the actor's office, employment, or agency.  28 U.S.C. §

1605A(a)(1).  Two of these statutorily denoted acts are relevant to this case: extrajudicial killing

and the provision of material support or resources.

Extrajudicial killing has the same meaning as it is given in section 3 of the Torture

Victim Protection Act of 1991.  *Id.* § 1605A(h)(7).  That section defines extrajudicial killing as

"a deliberate killing not authorized by a previous judgment pronounced by a regularly

constituted court affording all the judicial guarantees which are recognized as indispensable by

civilized peoples."  *See* Torture Victim Protection Act of 1991, Pub. L. No. 102-256, § 3(a), 106

Stat. 73 (excluding from the definition killings that are lawful under international law).  The

Beirut barracks bombing meets this definition.  It was carried out after careful planning and

caused the deaths of 241 servicemen.  No court proceeding affording basic guarantees of due

process and fairness authorized the attack.  Finally, the 24th MAU were not engaged in combat

operations; instead, its members were present only as peacekeepers and non-combatants. Thus, no colorable argument can be made that the killings were permissible under international law. In light of the fact that Hezbollah planned and perpetrated the attack after instigation and approval from MOIS and the Iranian government, the Court concludes that the acts of extrajudicial killing may be attributed to defendants on an agency theory. *Fain v. Islamic Republic of Iran*, 856 F. Supp. 2d 109, 121 (D.D.C. 2012). Furthermore, the facts found by the Court show that the attack was within the scope of Hezbollah's agency.

Provision of material support or resources, alternatively, also may form the basis of a waiver of sovereign immunity. The term has the same meaning as it is given in section 2339A of Title 18 of the U.S. Code. 28 U.S.C. § 1605A(h)(3). That section defines "material support or resources" as

> any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials.

18 U.S.C. § 2339A(b)(1).

The facts found by the Court demonstrate that defendants engaged in material support for acts of extrajudicial killing. The Court has found that Iran, through the "conduit" of MOIS, provided Hezbollah with explosives, funding, and training that led directly to the barracks bombing. These provisions meet section 2339A's expansive definition of "material support." Furthermore, because these provisions would have necessarily been approved by officials at the highest level of the Iranian government, defendants' material support for the bombing was evidently within the scope of office, employment, or agency.

Defendants are not entitled to sovereign immunity because this case satisfies each element of section 1605A(a)(1).  Because all of section 1330(a)'s requirements for jurisdiction are satisfied, the Court possesses original jurisdiction over this matter.

### 2.  Requirements for a claim to be heard

Section 1605A only applies if three conditions are met: (1) the foreign state was designated a state sponsor of terrorism at the time of the act giving rise to liability or was so designated in response to such act and remains so designated, (2) the claimant or victim was a national of the United States or member of the armed forces at the time of the act described in subsection (a)(1)[1], and (3) in cases where the act occurred in the foreign state against whom suit has been brought, the foreign state was afforded a reasonable opportunity to arbitrate the claim in accordance with the accepted international rules of arbitration.  28 U.S.C. § 1605A(a)(2).  Each of these conditions is met here.

First, Iran was designated by Secretary of State George P. Shultz on January 23, 1984, in accordance with the Export Administration Act of 1979, as a "country which has repeatedly provided support for acts of international terrorism."  49 Fed. Reg. 2836-02 (Jan. 23, 1984) (statement of Secretary of State George P. Shultz).  This designation meets section 1605A's definition of "state sponsor of terrorism."  28 U.S.C. § 1605A(h)(6).  This Court has previously determined that Secretary Shultz's designation was "in partial response to the Beirut bombing." *Valore*, 700 F. Supp. 3d at 67.  Iran continues to be designated as a state sponsor of terrorism to this day.  *State Sponsors of Terrorism*, U.S. Dep't of State, http://www.state.gov/j/ct/list/c14151.htm (last visited Nov. 24, 2014).  Thus, the first condition for a claim to be heard is met.

---

[1] A third category of claimant or victim that would meet section 1605A's requirements is not relevant here.

Plaintiffs meet the second requirement because all claimants or victims were nationals of the United States or members of the United States armed forces at the time of attack. Uncontroverted affidavit evidence has been submitted to the Court demonstrating that all but four of the plaintiffs, at the time of the bombing, were either United States citizens or members of the United States armed forces.  As to the remaining four, the plaintiffs have failed to submit evidence regarding their status.  Nonetheless, their claims shall be heard because these four plaintiffs base their claims on injuries suffered by victims who meet the statute's requirements.[2] *See Leibovitch v. Islamic Republic of Iran*, 697 F.3d 561, 570, 572 (7th Cir. 2012) (interpreting section 1605A(a)(2)(A)(ii) as allowing the court to hear intentional infliction of emotional distress ("IIED") claims under the FSIA brought by foreign family members of terrorism victims on the basis of those victims meeting one of section 1605A(a)(2)'s four categories).

Finally, plaintiffs have met the third requirement because the "act" described in subsection (a)(1)—i.e. the act of extrajudicial killing—occurred in Lebanon, not the defendant state.  Thus, plaintiffs were not required by statute to afford defendants a reasonable opportunity to arbitrate.

### 3.  Personal jurisdiction

Federal courts have personal jurisdiction over a foreign state if (1) the court has jurisdiction pursuant to section 1330(a) and (2) service has been properly made under section 1608 of the FSIA.  28 U.S.C. § 1330(b).  As established above, the requirements for jurisdiction

---

[2] Plaintiff Arley Buckmaster bring intentional infliction of emotional distress ("IIED") claims for emotional distress arising out of injuries suffered by bombing victim John Buckmaster.  Compl. ¶ 26.  John Buckmaster was a member of the United States armed forces.  Vicki Buckmaster Aff. ¶ 3, ECF No. 27-2 at 70.  Ollie James Edwards and Larry Edwards bring IIED claims for emotional distress arising out of injuries suffered by bombing victim Roy Lee Edwards.  Compl. ¶ 36.  Roy Lee Edwards was a member of the United States armed forces.  James Edwards Aff. ¶ 3, ECF No. 27-2 at 30.  Roscoe Hamilton brings IIED claims for emotional distress arising out of injuries suffered by bombing victim Virgel Dean Hamilton.  Compl. ¶ 43.  Virgel Dean Hamilton was a member of the United States armed forces.  Ramona Sue Hamilton Green Aff. ¶ 3, ECF No. 27-2 at 130.

under section 1330(a) are met in this case.  The Court next proceeds to an analysis of section

1608's requirements for service.

Section 1608(a) requires that service upon a foreign state or a political subdivision of a

foreign state—such as MOIS—be completed in one of four ways.  28 U.S.C. § 1608(a).  The

methods are presented in order of preference; a method of service must be unavailable or

unsuccessful for a party to attempt service under a later method.  *Id.*  The Court has already

determined that the first two methods of service were unavailable to plaintiffs and that the third

method was attempted but unsuccessful.  Order Regarding Service of Process at 2, May 17,

2013, ECF No. 8.  Therefore, plaintiffs were authorized to effect service under section

1608(a)(4).  *Id.*  That provision authorizes service

> [B]y sending two copies of the summons and complaint and a notice of suit,
> together with a translation of each into the official language of the foreign state,
> by any form of mail requiring a signed receipt, to be addressed and dispatched by
> the clerk of the court to the Secretary of State in Washington, District of
> Columbia, to the attention of the Director of Special Consular Services—and the
> Secretary shall transmit one copy of the papers through diplomatic channels to the
> foreign state and shall send to the clerk of the court a certified copy of the
> diplomatic note indicating when the papers were transmitted.

The Clerk of the Court certified mailing the specified documents, translated as required, to the

State Department on June 26, 2013.  ECF No. 11.  The State Department subsequently confirmed

transmission of the documents to the Iranian Ministry of Foreign Affairs by way of the Foreign

Interests Section of the Embassy of Switzerland in Tehran.  ECF No. 17.  Certified copies of the

diplomatic notes showing the date of transmission—July 31, 2013—were attached thereto.  ECF

No. 17-1.  In light of these filings, the Court concludes that plaintiffs have complied with section

1608(a)(4) and have, therefore, properly served defendants in accordance with the FSIA.   The

Court may exercise personal jurisdiction over defendants.[3]

### B.  Section 1605A's Statute of Limitations is Not Jurisdictional

Section 1605A includes a limitations provision, at subsection (b), setting out a series of

time periods within which an action under the section "may be brought or maintained."   28

U.S.C. § 1605A(b).   The Court is confronted today with a novel question: is this statute of

limitations a jurisdictional requirement, such that the Court must raise and consider it *sua*

*sponte*?   The circumstances of this case appear to raise a serious question regarding plaintiffs'

compliance with section 1605A's limitations provision.   Iran, in keeping with its typical practice

in cases of this type, has never appeared and has, therefore, not raised the issue.   Statutes of

limitations are typically treated as affirmative defenses that may be waived if not timely raised

by a party.   *John R. Sand & Gravel Co. v. United States*, 552 U.S. 130, 133 (2008).   This is

because their primary goal is usually to "protect defendants against stale or unduly delayed

claims."   *Id.*   On the other hand, some statutes of limitations have jurisdictional import and, like

other matters that go to the subject matter jurisdiction of the court, cannot be waived by the

neglect or inaction of the parties.   *See, e.g.*, *Griffith v. Barnes*, 560 F. Supp. 2d 29, 36–37

(D.D.C. 2008) (dismissing, *sua sponte*, certain claims as time-barred because the relevant statute

of limitations was a jurisdictional component of the statute).

To determine whether a limitations provision is jurisdictional, a court looks to its "text,

context, and relevant historical treatment."   *Menominee Indian Tribe of Wisconsin v. United*

*States*, 614 F.3d 519, 524 (D.C. Cir. 2010) (quoting *Reed Elsevier, Inc. v. Muchnick*, 559 U.S.

---

[3] The Court also notes that no minimum contacts threshold must be met as to the defendants, either as a matter of
constitutional or customary international law.  *See Valore*, 700 F. Supp. 2d at 70–71 (concluding that neither Iran
nor MOIS, as foreign states, were protected by the Fifth Amendment's Due Process Clause and that customary
international law did not come into play because it cannot prevail over a contrary federal statute).  Satisfaction of
section 1330(b) is all that is required for assertion of personal jurisdiction over defendants.

154, 166 (2010)).  If the words used by Congress "clearly state[d]" that the limitations period prescribed was jurisdictional, a court should treat it as such.  *Id.* (quoting *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 516 (2006)).  Absent such a clear textual indication, the court should consider "whether the structure of the statute or long-standing judicial precedent 'compel[s] the conclusion that . . . it nonetheless impose[s] a jurisdictional limit.'"  *Id.* (alteration in original) (quoting *Muchnick*, 559 U.S. at 162)).

### 1. Text

The Court first considers the text of section 1605A's limitations provision.  It is labeled "Limitations" and does not explicitly mention jurisdiction.  28 U.S.C. § 1605A(b).  This weighs against finding the requirement jurisdictional.  *See Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393–94 (1982) (holding that a statutory timely-filing requirement was not jurisdictional and finding important that the requirement did not "speak in jurisdictional terms or refer in any way to the jurisdiction of the district courts").

The picture is somewhat muddied, on the other hand, by consideration of the FSIA's jurisdiction conferring provisions.  Section 1330 states that district courts have original jurisdiction over a claim against a foreign state when that state "is not entitled to immunity either under sections 1605-1607 of this title or under any applicable international agreement."  28 U.S.C. § 1330(a).  Section 1604 of the FSIA states that foreign states "shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter."  28 U.S.C. § 1604.  These sections have been interpreted as describing opposite sides of the same coin: "§ 1604 bars federal and state courts from exercising jurisdiction when a foreign state *is* entitled to immunity, and § 1330(a) confers jurisdiction . . . when a foreign state is *not* entitled to immunity."  *Amerada Hess*, 488 U.S. at 434 (emphasis in

original).   Thus, one could plausibly conclude that for a court to have jurisdiction under the FSIA, a claim must be brought in compliance with all aspects of sections 1605 to 1607, including the limitations provision of section 1605A.

The Court holds, however, that interpreting the FSIA's text to indicate a jurisdictional limitations period does not accord with the Supreme Court's "bright line" rule that a statute "clearly state" that a particular provision is jurisdictional.  *See Sebelius v. Auburn Reg'l Med. Ctr.*, 133 S. Ct. 817, 824 (2013).  Sections 1330(a) and 1604 both focus on a foreign state's immunity or lack thereof as the sole factor relating to sections 1605 to 1607 that determines the subject matter jurisdiction of federal courts.  *See* 28 U.S.C. §§ 1330(a), 1604.  Under section 1605A, the only provision that refers to immunity is subsection (a), which states the types of allegations underlying a claim that will result in a foreign state not being entitled to immunity. *Id.* § 1605A(a)(1).  Subsection (b)'s limitations provision makes no mention of immunity and instead, in keeping with the usual claim management role played by statutes of limitations, simply states the time period in which a claim may be brought or maintained under the section. *Id.* § 1605A(b).

In *Muchnick*, the Supreme Court concluded that copyright law's requirement of copyright registration before filing an infringement claim was not jurisdictional.  *Muchnick*, 559 U.S. at 157–58, 169.  The Court's holding was based in part on the registration requirement's "locat[ion] in a provision 'separate' from those granting federal courts subject-matter jurisdiction over those respective claims."  *Id.* at 164.  Neither jurisdiction-conferring statute relevant to the suit "condition[ed] its jurisdictional grant on whether copyright holders have registered their works before suing for infringement."  *Id.* at 165.  Thus, for example, the Court held that the registration requirement is materially different from the diversity jurisdiction statute's amount in

controversy requirement. *Id.* at 162. The latter statute's arrangement demonstrates that the amount in controversy requirement is a "threshold ingredient" of diversity jurisdiction. *Id.* Similarly, in this case, the statutes creating jurisdiction over FSIA causes of action make no mention of the statute of limitations. Instead, the only "threshold ingredient" to jurisdiction relating to sections 1605 to 1607 is the absence of immunity under those sections. 28 U.S.C. §§ 1330(a), 1604. The FSIA's text does not clearly state that section 1605A(b) is a limitation on this Court's jurisdiction. A finding that it is jurisdictional is not warranted on a textual basis.

### 2. Structure of the FSIA

As to the FSIA's structure, an interpretation of subsection (b)'s limitations provision as non-jurisdictional—and, thus, as waivable—coheres with the way limitations operates for FSIA claims brought under section 1605. Section 1605, unlike section 1605A, does not contain an explicit statute of limitations. Instead, when state causes of action are brought under that section, "the local forum's statute of limitations applies to the action." *See Sea Search Armada v. Republic of Colombia*, 821 F. Supp. 2d 268, 272 (D.D.C. 2011) (citing *Gilson v. Republic of Ireland*, 682 F.2d 1022, 1025 n.7 (D.C. Cir. 1982)). Furthermore, courts have treated such state limitations as not "intertwined" with sovereign immunity issues and, thus, implicitly as non-jurisdictional. *See Abelesz v. Magyar Nemzeti Bank*, 692 F.3d 661, 666–67 (7th Cir. 2012) (declining to exercise pendent appellate jurisdiction over a statute of limitations defense because it was "not inextricably intertwined with the sovereign immunity argument"). It strikes the Court as anomalous that section 1605A, which expanded the rights of plaintiffs to recover against state sponsors of terrorism, would have a limitations provision of jurisdictional import when other parts of the FSIA did not.

### 3. Prior judicial precedent

Finally, in the absence of a clear congressional intent in the statute's text, "long-standing judicial precedent" can support holding a statutory requirement jurisdictional. *Menominee Indian Tribe*, 614 F.3d at 524. This Court has previously concluded on two occasions that section 1605A's statute of limitations is jurisdictional. *See Valore*, 700 F. Supp. 2d at 64, 69 (listing compliance with the statute of limitations as one of the requirements for subject matter jurisdiction in a case brought under section 1605A); *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 62, 66 (D.D.C. 2010) (same). Additionally, at least one other judge of this district has considered *sua sponte* plaintiffs' compliance with section 1605A's statute of limitations even though the defendant did not appear to raise the issue, potentially showing implicitly a jurisdictional view of the provision. *Estate of Doe*, 808 F. Supp. 2d at 7, 16–17.[4]

These prior cases do not constitute the sort of long standing judicial precedent which would support a conclusion that a provision is jurisdictional. In cases where the Supreme Court has found a precedent-based argument dispositive in holding a provision jurisdictional, "the Court rested its decision on a line of Supreme Court precedent dating back more than a century." *Menominee Indian Tribe*, 614 F.3d at 525. No such longstanding and well settled line of cases is present here.

Furthermore, the Court is of the view that a departure from its prior views is warranted. The Supreme Court has recently clarified its jurisprudence regarding when statutory procedural requirements should be interpreted to bear on a court's subject matter jurisdiction. *See Henderson ex rel. Henderson v. Shinseki*, 131 S. Ct. 1197, 1202–03 (2011) (stating that the Court has "tried in recent cases to bring some discipline to the use" of the term "jurisdictional" as applied to procedural rules in statutes). In so doing, it has expressed its intent that courts be

---

[4] The Court notes that in all three of the above-cited cases, the plaintiffs had complied with the statute of limitations. Thus, the Court's reconsideration of its prior views on this issue does not contradict any prior holdings of this Court.

more cautious in finding that particular provisions are jurisdictional. *Muchnick*, 559 U.S. at 161 (expressing a desire that courts undertake the sort of analysis described above before finding that a statutory requirement is jurisdictional). Applying this recently refined standard requires a different result than was previously reached by this Court.

In light of the foregoing, the Court concludes that compliance with section 1605A's statute of limitations is not required in order to assert subject matter jurisdiction. Therefore, the Court is not required to raise limitations on its own motion.

### 4. The Court will not discretionarily raise the limitations defense

The Supreme Court has recognized that a court can, as a matter of discretion, raise a preclusion defense on its own motion in "special circumstances." *Arizona v. California*, 530 U.S. 392, 412 (2000). Similarly, the Supreme Court has held that district courts may, in considering petitions for habeas corpus, consider the timeliness of those petitions *sua sponte*. *Day v. McDonough*, 547 U.S. 198, 209 (2006). In accordance with these cases, the Fourth Circuit has held that a court may generally consider affirmative defenses *sua sponte* when the proceedings "implicate important judicial and public concerns not present in the circumstances of ordinary civil litigation." *Clodfelter v. Republic of Sudan*, 720 F.3d 199, 209 (4th Cir. 2013) (internal citation omitted). With regard to the defense of res judicata in an FSIA case, that court held that "[c]omity in the face of an absent foreign sovereign present[ed] a special circumstance," which allowed the court to raise the defense on its own motion. *Id.* The court also noted that FSIA's requirement at section 1608(e) that default only be entered on "evidence satisfactory to the court" further supported the district court "tak[ing] a close look at a plaintiff's case." *Id.* at 209–10.

In this case, however, the Court declines whatever discretionary authority it may have to raise the defense of limitations on Iran's behalf.  It does so in light of the fundamental rule that statutes of limitations are generally treated as affirmative defenses that may be waived.  *John R. Sand*, 552 U.S. at 133.  Furthermore, before using its discretion to consider a defense not raised by a party, a court must "determine whether the interests of justice would be better served by addressing the merits or by dismissing the petition."  *Day*, 547 U.S. at 210 (internal citation and quotation marks omitted).  In this case, defendants have chosen not to appear in this litigation and they must take the consequences that attend that decision, including waiver of potentially legitimate defenses.  *See id.* at 210–11 (holding that dismissal *sua sponte* on the basis of limitations was appropriate where the record suggested it was mere "inadvertent error" that led the defendant to fail to raise the defense in its answer).  While the Court recognizes that considerations of international comity are compelling, it will heed Congress's determination that the statute of limitations is not a requirement for exercise of subject matter jurisdiction and proceed to consideration of the merits.

## C.  FSIA Liability

The state-sponsored terrorism exception provides a private right of action.  The action is available to, among others, nationals of the United States and members of the United States armed forces.  28 U.S.C. § 1605A(c).  Foreign states that meet subsection (a)(2)(A)(i)'s requirements as state sponsors of terrorism may be held liable under subsection (c).  *Id.*

Section 1605A's private right of action has five basic elements.  A plaintiff must prove: (1) "an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act" where (2) the act was committed, or the material support was provided, by the foreign state or agent of the foreign state, and the act (3) caused

personal injury or death (4) "for which courts of the United States may maintain jurisdiction under this section for money damages." *Id.* § 1605A (a)(1), (c).

### 1. Threshold determination of plaintiffs' and defendants' statuses

The Court first determines whether the parties are such that subsection (c)'s cause of action may be pursued.

#### a. Defendants are state sponsors of terrorism

Defendants, for the reasons stated above in part III.A.2, are state sponsors of terrorism within the meaning of section 1605A(a)(2)(A)(i) and may be held liable.

#### b. Entitlement of plaintiffs to bring section 1605A(c) action

All but four of the plaintiffs have demonstrated by uncontroverted affidavits that they are nationals of the United States or were members of the armed forces at the time of the attack,[5] thus demonstrating that they are among the types of parties that may bring a claim under subsection (c). 28 U.S.C. § 1605A(c)(1), (2).

Three plaintiffs—Arley Buckmaster, Larry Edwards, and Roscoe Hamilton—have submitted no evidence demonstrating that they fit within one of the four categories of persons that may bring a claim under section 1605A's private right of action. The Court directs the special master appointed by the Court's Order issued this date to collect evidence regarding whether these three individuals fit within one of the four categories of persons to whom a foreign state may be liable under section 1605A(c). If the Court cannot ultimately determine that these individuals are entitled to bring a section 1605A(c) claim, it shall, at that time, vacate its finding of liability as to them.[6]

---

[5] *See* Pl.'s Affs., ECF No. 27-2 at 6, 9, 24, 30, 33, 36, 39, 42, 55, 58, 61, 64, 67, 70, 73, 83, 86, 89, 91, 111, 130, 133; Pl.'s Affs., ECF No. 31-1 at 1, 3.

[6] Section 1605A allows plaintiffs who are not entitled to pursue subsection (c)'s cause of action to use section 1605A as a pass through to causes of action arising under other bodies of law. *See Estate of Doe*, 808 F. Supp. 2d at

Plaintiff Ollie James Edwards also has not submitted evidence demonstrating that he is within one of the categories of persons to whom a foreign state may be liable under section 1605A(c).  Furthermore, uncontroverted affidavit evidence submitted to the Court indicates that he is, in fact, the deceased father of one of the victims of the barracks bombing and that he died decades before the bombing.  *See* Ralph Clayton Edwards Aff. ¶ 8, ECF No. 27-2 at 40 (swearing that Ollie James Edwards was the father of Roy Lee Edwards and that he died on May 4, 1950).  A plaintiff may not pursue IIED claims for solatium damages under the FSIA if they were not alive at the time of the tort.  *Cf. Wamai v. Republic of Sudan*, ---F. Supp. 2d---, Civil Action No. 08-1349 (JDB), 2014 WL 3687179, at *4 n.4 (D.D.C. July 25, 2014) (awarding no solatium damages to the daughter of the victim of an attack because she was killed in the same attack).  Because the uncontroverted evidence submitted by plaintiffs establishes that Ollie James Edwards is not entitled to recover against defendants, his claim is hereby dismissed.

### c. *Standing of estate plaintiffs*

In some counts, estate plaintiffs bring claims for injuries suffered during the decedent's life.  These plaintiffs must establish their standing before they may recover for harms suffered during the decedent's lives.  *Taylor v. Islamic Republic of Iran*, 811 F. Supp. 2d 1, 12 (D.D.C. 2011) (noting that "recovery for pain and suffering . . . is not universally available to estate-plaintiffs").  The determination of whether an estate may maintain a cause of action for injuries suffered during the decedent's life is a question "governed by the law of the state which also governs the creation of the estate."  *Id.*  State law governs this question because it is not related

---

20 ("Although § 1605A created a new cause of action, it did not displace a claimant's ability to pursue claims under applicable state or foreign law upon the waiver of sovereign immunity.").  The Court expresses no opinion at this time as to whether plaintiffs would be entitled to use section 1605A as a pass through to asserting causes of action under other sources of law on the basis of their current complaint.

to the extent and nature of the claims at issue, but instead involves a threshold question regarding the "power of the estate to bring and maintain legal claims." *Id.*

Plaintiffs have presented no evidence regarding which state laws govern this question as to each estate plaintiff.  The Court will, therefore, refer the matter to the special master appointed by the Order accompanying this Memorandum Opinion.  The special master shall take evidence regarding which state laws govern this issue as to each decedent.  If, based on this evidence, the Court determines that relevant state laws preclude any estate plaintiff from recovering, the Court shall dismiss that plaintiff.

### d.  Standing of deceased plaintiffs

A small group of plaintiffs who appear to allege claims on their own behalf are deceased according to uncontroverted evidence submitted to the Court.  They are Arley Buckmaster, Larry Edwards, Ollie James Edwards, and Roscoe Hamilton.  For the reasons stated above, plaintiff Ollie James Edwards is dismissed from this case.  Plaintiffs Arley Buckmaster, Larry Edwards and Roscoe Hamilton require greater consideration.

Deceased persons are not proper parties.  *See* Fed. R. Civ. P. 25(a)(1) (requiring dismissal of an action if a motion to substitute a proper party is not made within 90 days after service of a statement noting the death of a party).  If a party dies during litigation, Rule 25 allows for the substitution of a proper party.  It states that once a formal suggestion of death is made on the record, a party or the decedent's successor or representative has 90 days in which to file a motion for substitution of a proper party.  *See id.*  The rule's time limit is only triggered by a formal statement of death on the record that identifies the successor who may be substituted as a party. *McSurely v. McClellan*, 753 F.2d 88, 98 (D.C. Cir. 1985).  The rule normally operates only in favor of those plaintiffs who have died during the pendency of litigation rather than when a

deceased person was named as a party at the initiation of the suit. *Mohammadi v. Islamic Republic of Iran*, 947 F. Supp. 2d 48, 54 n.2 (D.D.C. 2013) (stating that Rule 25 is "normally applied when a party dies during the pendency of an action").

Affidavit evidence demonstrates that Roscoe Hamilton died during the pendency of this litigation. Ramona Sue Hamilton Green Aff. ¶ 9, ECF No. 27-2 at 131. The Court does not have before it evidence indicating whether or not Arley Buckmaster or Larry Edwards died during or before this litigation commenced. The Court concludes that plaintiffs shall file a formal statement of death within 14 days of this date, identifying the successor that may be substituted as a party as to each of these individuals. *See Daskalea v. Washington Humane Soc'y*, 275 F.R.D. 346, 370 (D.D.C. 2011) (adopting this procedure in a similar situation). If no party or representative or successor moves for substitution within 90 days of that date, these plaintiffs' claims shall be dismissed. Furthermore, if the formal statement of death demonstrates that Arley Buckmaster and Larry Edwards were deceased at the time this litigation was commenced, the Court shall at that time consider the propriety of ordering substitution of a successor party despite this fact or whether their claims should be dismissed. *Compare Mizukami v. Buras*, 419 F.2d 1319, 1320 (5th Cir. 1969) (per curiam) ("[Rule 25] is not available to the appellants in the present case since [defendant] predeceased the filing of the action.") *with Mohammadi*, 947 F. Supp. 2d at 54 n.2 (finding substitution "appropriate" as to a named plaintiff who predeceased commencement of the action).[7]

### 2. Act

For the reasons stated in part III.A.1.*a*, the Court finds that the acts giving rise to this case are of the type for which a foreign state may be held liable under section 1605A(c). Specifically,

---

[7] The Court further notes that to the extent the persons representing these deceased plaintiffs are substituted, the Court orders the special master appointed by the Order accompanying this Memorandum Opinion to take evidence regarding which state governs the survival of the decedents' claims.

the evidence establishes that acts of extrajudicial killing were committed by defendants—through their agents in Hezbollah—and that defendants provided material support in furtherance of these acts.  These acts were within the scope of agency, office, or employment.

### 3.  Actor

Defendants may only be held liable under section 1605A(c) if the acts of extrajudicial killing were committed or the provision of material support made by defendants themselves or by their agents.  28 U.S.C. § 1605A(c).  As to the acts of extrajudicial killing, for the reasons set forth in part III.A.1.*a*, the Court concludes that Hezbollah was acting as the agent of defendants.  Thus, defendants may be held vicariously liable under section 1605A(c) for acts of extrajudicial killing committed by members of Hezbollah.  *See Valore*, 700 F. Supp. 2d at 75.  Alternatively and also for the reasons explained previously, defendants may also be held liable for their provision of material support to Hezbollah.  *See Roeder*, 333 F.3d at 234 (holding that the actions of political subdivisions of a foreign state are attributable to the foreign state itself under the FSIA because they are treated as legally the same).

### 4.  Theory of recovery—causation and injury

The elements of causation and injury in § 1605A(c) require FSIA plaintiffs "to prove a theory of liability" which justifies holding the defendants culpable for the injuries that the plaintiffs have allegedly suffered.  *Valore*, 700 F. Supp. 2d at 73; *see also Rimkus*, 750 F. Supp. 2d at 175–76 ("[P]laintiffs in § 1605A actions . . . must articulate the justification for such recovery, generally through the lens of civil tort liability.").  While section 1605A(c) requires courts to determine the substantive basis for liability arising under it, the court is not given the authority (or duty) to articulate "federal common law."  *Valore*, 700 F. Supp. 2d at 76.  Instead, because liability under section 1605A(c) is based on "statutory rights," federal judges are

instructed to "find the relevant law, not to make it." *Bettis v. Islamic Republic of Iran*, 315 F.3d 325, 333 (D.C. Cir. 2003).   Thus, judges may not "fashion a complete body of law" in considering claims under section 1605A(c).   *Id.*   Based on the D.C. Circuit's guidance, district courts in this jurisdiction "rely on well-established principles of law, such as those found in the Restatement (Second) of Torts and other leading treatises, as well as those principles that have been adopted by the majority of state jurisdictions" to define the elements and scope of these theories of recovery.   *Oveissi v. Islamic Republic of Iran*, 879 F. Supp. 2d 44, 54 (D.D.C. 2012) (quoting *In re Islamic Republic of Iran Terrorism Litig.*, 659 F. Supp. 2d 31, 61 (D.D.C. 2009)). Plaintiffs bring claims for wrongful death, survival claims, solatium, assault and battery, intentional infliction of emotional distress ("IIED"), and for punitive damages.   The Court will consider each cause of action below.[8]

### a. Wrongful death

Estates of some deceased service members bring claims for wrongful death.   Compl. Counts I, V, XVIII, XXI.1[9].   This Court has previously determined that a decedent's heirs at law, through the decedent's estate, may bring a wrongful death action under section 1605A(c) "for economic losses which result from a decedent's premature death."   *Valore*, 700 F. Supp. 2d at 78 (internal citation omitted).   Where defendants are liable for a decedent's extrajudicial killing, as these defendants are, they may be held "liable for the economic damages caused to decedents' estates."   *Id.*   Plaintiffs' have sufficiently proved the validity of their wrongful death theory of recovery against defendants.

### b. Assault and battery

---

[8] Throughout their complaint, plaintiffs seek to recover "pursuant to" section 1605A and "in accordance with" federal common law.   As explained in this paragraph, no such "federal common law" exists with respect to FSIA liability.   Therefore, the Court shall ignore this aspect of plaintiffs' complaint.

[9] Plaintiffs number two of the counts in their complaint as "XXI."   XXI.1 refers to the second iteration of count XXI.

Survivors of the attack—including estates of those survivors who have since died—have alleged assault and battery.  Compl. Counts IX, LIII, LIV, LVII.  A defendant's liability for assault in a section 1605A(c) case is established if "(1) it acted 'intending to cause a harmful contact with . . . , or an imminent apprehension of such a contact' by, those attacked and (2) those attacked were 'thereby put in such imminent apprehension.'"  *Valore*, 700 F. Supp. 2d at 76 (alteration in original) (quoting Restatement (Second) of Torts § 21(1)).  Liability for battery arises when a defendant "acted 'intending to cause a harmful or offensive contact with . . . , or an imminent apprehension of such a contact' by, those attacked and (2) 'a harmful contact with' those attacked 'directly or indirectly result[ed].'"  *Valore*, 700 F. Supp. 2d at 77 (alteration in original) (quoting Restatement (Second) of Torts § 13).

The Court concludes that element one of both assault and battery has been sufficiently proved, as "acts of terrorism are, by their very nature, intended to harm and to terrify by instilling fear of further harm."  *Id.*  As for element two of each theory, the Court does not presently have sufficient proof before it to establish each individual plaintiff's right to recover on these bases.  Uncontroverted affidavit evidence does, however, establish that at least one plaintiff was put in imminent apprehension of harmful contact and did suffer such harmful contact as a result of the bombing.  *See* Mario Haroldo Vasquez Aff. ¶¶ 5–6, ECF No. 27-2 at 25.  The Court concludes that, on the basis of this affidavit, plaintiffs have established a valid theory of recovery on their assault and battery claims.  To the extent any plaintiffs alleging assault or battery are unable to present proof of their injuries to the special master, their claims shall be dismissed.

### c. *Intentional infliction of emotional distress*

Relying principally on the Restatement (Second) of Torts, this Court has set out the following standard for recovery on a theory of IIED in section 1605A(c) cases: "One who by

extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm." *Estate of Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20, 26 (D.D.C. 2009) (quoting Restatement (Second) of Torts § 46(1)).

An actor may also be liable for IIED to a party against whom the extreme and outrageous conduct was not directed if that party is (1) a member of the victim's immediate family and (2) was present at the time of the extreme and outrageous conduct. *See Murphy*, 740 F. Supp. 2d at 75 (citing Restatement (Second) of Torts § 46(2)(a)).[10] The "immediate family" requirement is strictly construed in FSIA cases; generally, only spouses, parents, siblings, and children are entitled to recover. *Id.*[11] As to the issue of presence, this Court has previously held that one "need not be present at the time of a terrorist attack upon a third person to recover for severe emotional injuries suffered as a result." *Valore*, 700 F. Supp. 2d at 80. This is because terrorism is sufficiently extreme and outrageous to demonstrate that it is intended to inflict severe emotional harm on even those not present at the site of the act. *Id.*

The servicemen plaintiffs have established defendants' liability as to their IIED claims. As this Court has previously held in cases arising out of the Beirut barracks bombing, "[a]cts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress." *Murphy*, 740 F. Supp. 2d at 74 (quoting *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 22 (D.D.C. 2009)). At least one plaintiff has established by uncontroverted affidavit evidence that he suffered emotional distress. Mario Haroldo Vasquez

---

[10] Plaintiffs style their third party IIED claims in this manner: "solatium claim pursuant to 28 U.S.C. § 1605A and in accordance with the federal common law for intentional infliction of emotional distress." *See, e.g.*, Compl. Count XX. Under the FSIA, a "solatium claim is indistinguishable from an IIED claim." *Valore*, 700 F. Supp. 2d at 85. Therefore, the Court will apply the standards for IIED to all of plaintiffs' claims that are variously styled solatium and IIED.

[11] Though not apparently relevant to these plaintiffs, the Court notes also that half-blood siblings may generally recover to the same extent as full-blood siblings. *Valore*, 700 F. Supp. 2d at 79. Additionally, courts may award solatium damages to individuals who are the "functional equivalents of immediate family members." *Id.*

Aff. ¶¶ 5–6.  This is sufficient to show that plaintiffs have a valid theory of recovery against defendants as to IIED.  If any plaintiff cannot provide sufficient proof regarding his or her injuries to the special master, their claims shall be dismissed.

The family members of servicemen injured and killed in the attack have also met the additional elements that attend an IIED claim for actions directed against a third person.  Each has established by uncontroverted affidavits that they are immediate family members of servicemen present at the attack.  Furthermore, although the family member plaintiffs do not allege that they were present at the site of the Beirut attack, this requirement has not been imposed in cases arising out of the Beirut barracks bombing because of the particularly extreme and outrageous nature of the terrorist conduct at issue.

Plaintiffs, except for Ollie James Edwards for the reasons stated in part III.C.1.*b*, have established a valid theory of recovery with respect to their IIED claims.

### d.  Survival actions

Several counts of plaintiffs' complaint plead "survival claims."  *See* Compl. Counts II, VI, XIX, XXII.  Each one seeks damages for harms suffered between the initial moment of injury and decedent's death.  *See id.*  Additionally, although not termed survival claims, several deceased plaintiffs allege causes of action for harms suffered during the decedent's life.  *See* Compl. Counts VII, XVI, XX.

A survival claim is one "that could have been brought by the decedent, had he lived to bring it."  *Valore*, 700 F. Supp. 2d at 77 (citing Restatement (Second) of Torts § 926).  The recovery is limited, however, to harms suffered before death.  Restatement (Second) of Torts § 926(a).  As discussed above, all plaintiffs seeking damages for harms suffered during the decedent's life must have standing under the particular state law relevant to each deceased

plaintiff which governs the survival of rights of action after death.  If they do, plaintiffs' claims, all apparently lodged on theories of battery and IIED, present a valid theory of recovery against defendants for the reasons stated in the sections regarding defendants' liability on those theories.

### e.  Punitive damages

Plaintiffs' complaint also contains a number of counts seeking punitive damages.  Compl. Counts IV, VIII, XII, XXI, XXIV, LVI.  Punitive damages is not an independent cause of action. *Botvin v. Islamic Republic of Iran*, 604 F. Supp. 2d 22, 25 (D.D.C. 2009).  This is not the end of the matter, however.  Plaintiffs have alleged a number of independent claims for which punitive damages may be an appropriate remedy.  *Cf. Rimkus*, 750 F. Supp. 2d at 175–76 (allowing a "claim" for punitive damages to proceed because it was supported by sufficiently specific allegations of a cause of action under section 1605A).  The Court shall treat plaintiffs' punitive damages counts as, in effect, a request for punitive damages as a remedy for their other claims against defendants.  *See Park v. Hyatt Corp.*, 436 F. Supp. 2d 60, 66 (D.D.C. 2006) (treating a claim for punitive damages as "part of an ad damnum clause").  The Court will consider the proper measure of punitive damages, if any, at the time it considers the special master's recommendations regarding compensatory damages.

### 5.  Personal injury

As was already established in part III.A.1.*a* and for the reasons stated in that part, this suit is one for "person injury or death."  This element of section 1605A(c)'s private right of action is also met.

### 6.  Jurisdiction

For the reasons laid out above in part III.A, the Court "may maintain jurisdiction" over this suit.  In light of plaintiffs' satisfaction of subsection (c)'s requirements, the Court concludes that defendants may be held liable to them on the basis of this statute.[12]

### D.  Liability Under Non-Federal Law

In some counts of their complaint, plaintiffs seek survival and wrongful death damages arising under both section 1605A's private right of action and District of Columbia law.  Compl. Counts I, II, V, VI, XVIII, XIX, XXI.1, XXII.  In each instance, plaintiffs' prayer for damages is only premised on one set of injuries.  Plaintiffs can only have one recovery for their injuries, regardless of the number of theories upon which they base their complaint.  *Kassman v. Am. Univ.*, 546 F.2d 1029, 1034 (D.C. Cir. 1976) ("Where there has been only one injury, the law confers only one recovery, irrespective of the multiplicity of parties whom or theories which the plaintiff pursues.").  Section 1605A(c) authorizes recovery for pain and suffering and economic losses (including those accruing to estates of decedents).  28 U.S.C. § 1605A(c); *Valore*, 700 F. Supp. 2d at 83.  Because defendants are liable under section 1605A(c) and because that subsection explicitly provides for the type of damages that plaintiffs seek in each of the above noted counts (upon sufficient proof of course), the Court will proceed only on the basis of the section 1605A(c) claims for each of the counts named in this paragraph.  *See Belkin*, 667 F. Supp. 2d at 22–23 (declining to award damages on two counts of a complaint because, although the complaint pled causes of action under District of Columbia and Israeli law, the requested damages were duplicative of a wrongful death count arising under section 1605A(c)).[13]

---

[12] The Court again notes that it shall vacate its holding as to the plaintiffs named in part III.C.1.*b* if it is determined that they do not in fact meet the status requirements of section 1605A(c).  Furthermore, the plaintiffs named in sub-parts III.C.1.*c* and *d* shall be dismissed if the contingencies described in those sub-parts come to pass.

[13] The Court notes that to the extent any plaintiffs do not have standing to bring survival claims as a matter of the relevant state laws governing the estates (as discussed above), recovery would be precluded under both District of Columbia law and section 1605A(c).

## IV.  SPECIAL MASTER

Section 1605A authorizes federal courts to "appoint special masters to hear damage claims brought under this section."  28 U.S.C. § 1605A(e)(1).  While the Court today makes legal conclusions regarding defendants' liability, it does not have sufficient evidence before it to ascertain the amount of damages to which each plaintiff may be entitled.  The Court will, therefore, invoke its power under the FSIA to appoint a special master for the purpose of taking evidence and filing a report and recommendation regarding the amount of individual damages for which defendants may be liable to each plaintiff.[14]

On July 2, 2010, in *O'Brien v. Islamic Republic of Iran*, a case arising out of the same facts as the present matter, the Court adopted an Administrative Plan Governing Special Masters. The Court shall adopt that plan in this case as well.  It is attached to plaintiffs' motions for appointment of a special master.  *E.g.*, Administrative Plan Governing Special Masters, ECF No. 25-2.  While the plaintiffs have restyled the plan attached to their motions with the caption for this case, it is otherwise identical to the plan adopted in *O'Brien* and, thus, provides sufficient guidance to the special master and the parties regarding the special master's duties and authority.

In accordance with Federal Rule of Civil Procedure 53, the Plan sets forth potential masters' qualifications, duties, powers, compensation method, and method of appointment. According to the Plan, in appointing a master the Court must examine the potential master's curriculum vitae as well as an affidavit by the potential master indicating that he has read and will abide by the Plan if appointed.  *Id.* at 2.  Rule 53 additionally requires that a potential master "file[] an affidavit disclosing whether there is any ground for [his] disqualification under 28 U.S.C. § 455."  Fed. R. Civ. P. 53(b)(3)(A).

---

[14] The special master shall also carry out such additional duties as are specified in the Order accompanying this Memorandum Opinion and also issued this date.

Plaintiffs have moved for the appointment of three special masters: Alan Balaran, Larry Searle Lapidis, and Ronald Hedges. ECF Nos. 23–26. The Court is of the view that Alan Balaran is an appropriate selection as special master in this case given his familiarity with the Court's expectations of a special master in section 1605A cases. Mr. Balaran has complied with the initial requirements of the Court's Administrative Plan, making his appointment permissible under that Plan and under the Federal Rules of Civil Procedure. *See* ECF Nos. 25-2, 25-3. The Court is confident that, assuming he receives sufficient and appropriate cooperation from the plaintiffs, Mr. Balaran will be more than capable of timely complying with the Court's Order. Therefore, the Court sees no need at this time for the appointment of additional masters. Plaintiffs' motion for the appointment of Alan Balaran is granted; their motions for the appointment of Larry Searle Lapidis and Ronald Hedges are denied.

## V. CONCLUSION

For the foregoing reasons, the Court holds that judgment shall be entered against defendants as to all issues of liability except that: (1) this judgment shall be vacated as to plaintiffs Arley Buckmaster, Larry Edwards, and Roscoe Hamilton if the Court ultimately determines that no evidence supports their bringing a claim under 28 U.S.C. § 1605A(c); (2) plaintiff Ollie James Edwards is dismissed with prejudice because the uncontroverted evidence submitted indicates that he is not entitled to recover; and (3) plaintiff Jeff Dadich is dismissed without prejudice for failure to plead any cause of action or right to recover against defendants.

Plaintiffs shall file a formal suggestion of death as described herein within 14 days of this date regarding Arley Buckmaster, Larry Edwards, and Roscoe Hamilton. If no party or successor or representative moves for substitution of a proper party within 90 days of that formal suggestion, these plaintiffs' claims shall be dismissed. The Court makes no determination today

whether, if it is shown that Larry Edwards or Arley Buckmaster were deceased at the commencement of this litigation, substitution would be proper as to them.

The Court will refer this matter to special master Alan Balaran for the taking of evidence on and recommendation of findings regarding the measure of compensatory damages warranted for each plaintiff and such other matters specified in the Order accompanying this Memorandum Opinion.

The Court defers consideration of the appropriate level of punitive damages, if any, until the matter of compensatory damages becomes ripe for consideration.  Finally, the Court notes that it shall dismiss those plaintiffs' claims that rely on the survival of causes of action if the relevant state laws governing survival preclude recovery.  This issue will be decided at the time the Court considers an entry of final judgment against defendants.

Signed by Royce C. Lamberth, United States District Judge, on December 8, 2014.