UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NANCY WORLEY, et al., )<br>)<br>Plaintiffs, )<br>)<br>v. )<br>)<br>THE ISLAMIC REPUBLIC OF IRAN, et al., )<br>)<br>Defendants. )<br>) | Case No.: 1:12-cv-02069 (RCL) |

REPORT OF SPECIAL MASTER REGARDING COUNTS I - IV
(David E. Worley)

This action is brought pursuant to 28 U.S.C. § 1605A by the estate and family members of deceased Navy Corpsman David E. Worley who was killed in the terrorist bombing of the Marine headquarters in Beirut, Lebanon on October 23, 1983. In accordance with the Administrative Plan Governing Special Masters, and pursuant to the provisions of Federal Rule of Civil Procedure 53, the Special Master has received testimonial and documentary evidence to assist in determining any damages to which the Estate of David E. Worley and his family members may be entitled.

HISTORICAL BACKGROUND

Shortly after dawn on October 23, 1983, a Mercedes truck filled with 2,500 pounds of explosives broke through a series of steel fences and sandbag barricades and ripped through the heart of the Marines' administrative headquarters building. That building, nicknamed the BLT, housed nearly 400 members of Battalion Landing Team 1/8 and other attached Marines, sailors and soldiers. The detonation tore the four-story building from its foundation and the barracks imploded in a matter of seconds, leaving a crater 30 feet deep and 40 feet wide and killing 241 servicemen and wounding 81 others. It represented the deadliest single-day death toll for the

United States Marine Corps since the Battle of Iwo Jima and the deadliest single-day death toll for the United States military since January 21, 1968 – the first day of the Tet Offensive during the Vietnam War. The Beirut bombing remains the deadliest post-World War II attack on Americans overseas.

The events of that day and its aftermath have been amply chronicled and will not be repeated except as relevant to assessing individual damages. *See, e.g.*, Glenn E. Dolphin, *24 MAU 1983: A Marine Looks back at the Peacekeeping Mission to Beirut, Lebanon* (2005); Eric Hammel, *The Root: The Marines in Beirut August 1982 – February 1984* (1999). Similarly, the historical overview of the statutory scheme by which actions against the Islamic Republic of Iran have been brought has been exhaustively recounted in multiple opinions of this Court, *see generally, In re: Islamic Republic of Iran Terrorism Litigation*, 659 F.Supp.2d 31 (D.D.C. 2009), as well as in the U.S. Congressional Research Service's *Suits Against Terrorist States by Victims of Terrorism* (RL31258, August 8, 2008) by Jennifer Elsea, obviating the need for recapitulation.

RELEVANT PROCEDURAL HISTORY

On December 28, 2012, plaintiffs – servicemen, relatives of servicemen and those representing the estates of deceased members of these groups – filed a complaint seeking damages for injuries sustained in the 1983 Beirut bombing. *Worley, et al. v. Islamic Republic of Iran, et al.*, 12-2069 (RCL). ECF No. 1. On March 11, 2014, prompted by defendants' failure to file an answer to the complaint, plaintiffs moved for default judgment pursuant to Fed.R.Civ.P. 55(b)(2) and asked the court to take judicial notice as to the findings of liability made against the same defendants in the related cases of *Peterson, et al. v. Islamic Republic of Iran, et al.*, 1:01-cv-02094 and *Fain, et al. v. Islamic Republic of Iran, et al.*, 1:12-cv-00042. ECF No. 18. On May 22, 2014, plaintiffs filed an Affidavit for Default, asking the clerk of the court to "enter a

Default against said defendants." ECF No. 20.  The clerk entered default on May 23, 2014.  ECF No. 21.  The record reflects that Plaintiffs again moved for Default Judgment on June 2, 2014 (ECF No. 22) and on September 4, 2014.  ECF No. 27.  On September 4, 2014, plaintiffs also requested the appointment of a special master, (ECF Nos. 24 -26).

To confirm plaintiffs' assertion that the underlying complaint was filed as a related action to *Peterson v. Islamic Republic of Iran*, 01-2094 (RCL), and in accordance with the 60-day deadline imposed by 28 U.S.C. § 1605(a)(7), the Court, on October 6, 2014, directed plaintiffs to supply additional briefing on "the statute of limitations under the FSIA [Foreign Services Immunities Act]."  ECF No. 28.  In its Order, the Court observed that a "related action," as defined in the National Defense Authorization Act for Fiscal Year 2008 Pub. L. No. 10-181, §1083(c)(3), 122 Stat. 341 (2008) ("2008 NDAA"), is deemed timely filed if "commenced not later than the latter of 60 days after – (A) the date of the entry of judgment in the original action; or (B) the date of the enactment of this Act."  *Id.*  The Court directed plaintiffs to address:  (1) the timeliness of the complaint, noting that 60 days had passed since final judgment was entered on September 7, 2007 in the *Peterson* case and the January 28, 2008 enactment of the 2008 NDAA and (2) whether the Court was obligated to consider the statute of limitations despite the fact that the issue "is generally an affirmative defense" that must be raised by defendants.  *Id.*  In accordance with the Court's directive, plaintiffs filed a supplemental memorandum on October 16, 2014, asserting that the underlying complaint was timely filed and classified as a "related case" to *Spencer v. Islamic Republic of Iran*, 12-0042 (RCL).  ECF No. 29.

On December 1, 2014, plaintiffs filed a "Notice of Related Case," invoking *Peterson* as well as 14 other cases arising out of the same set of facts and against the identical defendants.  ECF No. 30.  That same day, plaintiffs filed a Supplemental Memorandum Pursuant to Court

Order and in Regards to Motion for Judicial Notice on Liability ("Supplemental Memorandum") reiterating their position that the complaint was timely filed and, again, requesting the Court to take judicial notice of the findings of fact made in *Spencer*. Appended to the Supplemental Memorandum were two affidavits – one by Esther Buckmaster and one by Robert Preston Hamilton, Jr. – each attesting, respectively, to emotional injuries they suffered as a result of the deaths of their relatives, Marine John Buckmaster and Virgel Dean Hamilton on October 23, 1983. ECF No. 31.

On December 8, 2014, the Court granted, in part, plaintiffs' motion for default judgment on liability – carving an exception for those claims brought by plaintiff Jeff Dadich, whose action the Court dismissed without prejudice "for failure to plead any cause of action or right to recover against defendants," and by plaintiff Ollie James Edward, whose action the Court dismissed with prejudice. ECF No. 32. The Court directed plaintiffs to file a Suggestion of Death within 14 days as to Arley Buckmaster, Larry Edwards and Roscoe Hamilton. *Id*. The Court also appointed the undersigned as special master to be governed by the Administrative Plan Governing Special Masters previously adopted in *O'Brien v. Islamic Republic of Iran*, Civil Action No. 06-0690 (RCL). *Id*. The Court directed the special master not only to recommend compensatory damages for each plaintiff, but: (1) to report on "each plaintiff's qualification for relief under § 1605A(c)"; (2) to report any "evidence relevant to whether plaintiffs Arley Buckmaster, Larry Edwards, and Roscoe Hamilton may bring a claim under 28 U.S.C. § 1605A(c); and (3) to report any evidence "of the state or states which govern the survival of deceased plaintiffs' claims, as named above in this Order." *Id*.

In accordance with these directives and in keeping with the Federal Rules of Evidence, the Special Master makes the following findings and recommendations.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

1. David E. Worley was born on June 26, 1958 and was a United States citizen.

2. On October 23, 1983, Mr. Worley was serving as a naval corpsman, stationed in Beirut, Lebanon.

3. On October 23, 1983, the Marine Barracks in Beirut were attacked by a suicide bomber who drove a truck carrying a large cache of explosives into the building. Upon impact, the explosives detonated, collapsing the building and resulting in the deaths of 241 American personnel.

4. The "Certificate of Death (Overseas)" (U.S. Navy Form DD2064) provided by plaintiffs, indicates Mr. Worley died as a result of the Beirut bombing.

5. Pursuant to Letters of Administration from the State of Maryland, Nancy Worley, David Worley's widow, was appointed Administrator of his estate on August 24, 2012.

6. Plaintiffs have supplied an affidavit of counsel attesting that the State of Maryland governs survival claims. See Exhibit A. Plaintiffs have also supplied a memorandum citing *Md. Code Ann., Cts. & Jud. Proc.* § 3-902 as the applicable statute. See Exhibit B.

7. Pursuant to the December 8, 2014 Court Order, Mr. Worley's estate and his family members, all United States citizens, are qualified for relief under 28 U.S.C. §1605A(c).

**Testimony of Nancy Leah Worley – David Worley's Widow**

Nancy Worley was born on November 22, 1959 and currently resides in Gettysburg, Pennsylvania. She married David Worley on June 4, 1977 and they had two sons – David Aaron and Brian Christopher. Nancy testified that she, David and their two children all are United States citizens.

Nancy recalls living four doors away from David when they were children in Baltimore Highlands, a Maryland neighborhood. She testified that she and David began dating in high school and describes David as "funny," "popular" and "sweet." Nancy recounts how David aspired to be in the Navy since he was a child and he fulfilled that goal when he enlisted in or about 1979. She testified that David initially had a difficult time adjusting to military life but, once he began corpsman training, "fell in love with that and then he was good." According to Nancy, David planned to retire from the Navy after 20 years of service and pursue a career in medicine.

David was stationed at Camp Lejeune when he learned about his Beirut deployment. While he was on tour, Nancy and her two sons rented a small house in Rock Hill, South Carolina, where she had friends and family. Nancy recalls receiving weekly letters from David while he was overseas, though "toward the end," she received "an awful lot more." In his letters, David explained he was apprehensive because although the American troops deployed in Beirut were armed, they were not authorized to load their weapons. In one letter, he described increasing sniper fire and attacks on the Americans stationed in the area. Nancy notes that David was barracked in the fourth floor of the headquarters building.

On the morning of October 23, 1983, Nancy recounts that she was in bed fighting a cold while her two sons attended Sunday school when a neighbor knocked on the front door to see if Nancy was "doing okay." Sensing Nancy had not yet learned of the bombing, the neighbor informed Nancy that "something happened," prompting Nancy to turn on the news. She remembers "the first image I'd have to say took my – it kind of took my breath away. I just kind of – everything just stopped, but I didn't freak out or fall apart. I just went what the heck, and I sat down cross legged right there in front of [the television]." She continued watching television,

firmly believing David must somehow have survived the bombing.  Nancy's attempts to secure information from the Red Cross as to David's status were unavailing.

Nancy testified she was in "absolute denial" after the bombing.  She was first notified David was missing by Navy personnel who visited her at home.  Nancy recalled thinking at the time that her husband "was a corpsman, and if anybody would have to run to try to help everybody it would have been the corpsman… so I was convinced he's just not getting in touch because he's too busy.  He can't stop for a second.  They're digging people out.  He's okay."  She resolved to remain strong for her children, whom she did not inform their father was missing.  Nancy's mother drove from Baltimore to be with Nancy and her children.

Nancy did not specify how much time elapsed before she was notified of David's death.  Upon receiving the news, she recounts, "I just lost it . . . . I still need him.  I just lost it."  Realizing she still had children to care for, "I kind of put a lid on it."  Nancy remembers David "was one of the last ones identified" and his body did not return to the States until approximately November 4.

David was buried at Arlington National Cemetery.  Nancy recalls being "secretly" escorted into the room containing her husband's coffin, because the area was swarming with the press.  At the funeral, she refused to allow an open casket, "because I couldn't look at him like that."  Nancy testified being devastated: "it destroyed my life.  It wiped out my family.  It took away our future.  It took away the father for my kids."  Nancy testified she still has not "gotten over it.  There's no getting over the hurdle.  There's no fixing it.  You know, -- it's just gone."  For ten years, she kept "seeing him in a crowd."  Nancy never sought counseling, noting that it was not offered.  "It wasn't an act of war," she explains, "we didn't get any of that [counseling], or if everybody else got it, I didn't know about it."

Nancy testified: "I don't wake up without thinking about him, and I don't go to bed without thinking about him every day."  She wishes she would have turned the car around when she was dropping David off to leave for Beirut.  "I know my husband loved what he was doing, I know he did and I get that, but we never thought this would be the end result."

**Testimony of David Aaron Worley – David E. Worley's Son**

David Aaron Worley currently resides in California with his wife and son.  David's parents are Nancy and David E. Worley and he has two brothers - Bryan and Michael.  David testified he is a United States citizen as was his father, whom he notes, was born in Baltimore, Maryland.  David testified he was five years old when his father died in the Beirut bombing.

David recalls "mov[ing] around a lot" as a child because his father was "transferred from base to base."  It was "always a surprise and a shock," to find his father at home.  He has memories of his father describing "all of the different medical supplies that he would bring home and show[ing] me how to use.  Just little things like tongue depressors and a stethoscope, but you know, it was really exciting.  It was something that we could be interested in together."

David remembers "clearly," his father coming home and "telling Mom that he had volunteered" to go on the Beirut deployment.  David sensed his mother's apprehension, but she agreed that it was a good idea in terms of his father's "career advancement."  David recalls seeing his father in uniform the day he deployed to Beirut.

Following the bombing, David remembers "a dressed uniform guy that came to the house and saluted my Mother . . . then she started crying and I remember crying."  He recalls his grandmother staying with them and believes he "was very selfish at the time" because he remembers thinking "I still need my Dad.  It just really wasn't fair."  He also remembers his

mother exhausted and unable to console him and seeing reporters waiting in the family's front yard.

David testified that, in the years after the bombing, "my Mom, she really did lose it to be honest." For the next "fifteen to seventeen years, we would move every few months to someplace new." David believes his father's death "shaped, literally everything that has happened in my life since then."

**Testimony of Bryan Christopher Worley – David E. Worley's Son**

Bryan Worley currently resides in Massachusetts where he studies violin making. He is divorced and has one daughter. Bryan was born on January 19, 1981 to Nancy and David E. Worley. He has an older brother, David and "a younger, half-brother," Michael Christian Worley. All are United States citizens. Bryan testified he left high school in his senior year, joined the Navy and started boot camp training on April 20, 1999. His decision was partly based on his feeling that the Navy was "the Family Business" and partly because he did not know what to do with his life. He served as a helicopter mechanic.

As Bryan was only two years of age when the bombing occurred, "most of what [he] know[s] about my Dad is through other people." His earliest memories arise from events transpiring after his father's death. He knows his Mom and Dad met while in high school and were neighbors on the same street in Landsdowne, Maryland. He believes they had a loving relationship because of "the amount my mom has held onto his memory and him." Bryan believes his parents separated, at some point, for a very brief time but reunited "because they missed each other so much."

Bryan does not remember his father's funeral, but does recall attending a memorial held at Arlington Cemetery on the first year anniversary of the bombing, during which he was

admonished for climbing one of the cherry trees. He testified he visits his father's grave "a few times a year."

Bryan recalls how, following his father's death, his mother "had it tough" caring for two "rowdy" sons. He remembers living with his grandmother while he was in the first grade and that his mother "would kind of bounce us around between relatives and such." Bryan and his brother resumed living with their mother when he was approximately seven or eight years old.

According to Bryan, he, his mother and brother "rarely, if ever, talked to each other about our emotions regarding the bombing and losing Dad." Although they did not discuss the bombing, Bryan notes that his mother was "really good" about telling him as much as she could about his father. When he was younger, Bryan also visited with his paternal grandmother, uncle and cousins.

Bryan characterized his childhood as "tough," explaining that he got into "a lot of fights" with his peers who teased him for not having a father. He realized his father's death created a gap in his life, but given his age, he "really didn't understand too much." Now an adult and a father, Bryan longs for his own father, wishing he were around to ask him questions. "[T]he bottom line was that I didn't have my Dad. I'd give anything in the world for my Dad."

"I try as hard as I can to keep his memory alive because, you know, it's all that I have of him." Bryan feels it is his "job" is to maintain his father's "legacy" and that "the easiest way for me to do it is to just incorporate him, talk about him and think about him – like you would with anyone that you care about." Concluding his deposition, Bryan observed: "[m]y Mom tried her best. My brother and I drew close, but the fact of the matter is, I was two years old when my Dad was murdered and I have no memory of him. And that hurts."

**Testimony of John Robert Worley – David E. Worley's Brother**

John Worley was born to Karl and Betty Worley on August 28, 1952. He is divorced with one child and currently resides in Maryland. John's father passed away in 1994 and his mother, in 1996. John is five years older than his brother David; he testified he and David "were close. All the way to the end."

John recounted that David "dropped out" of school in the ninth grade. He believes David eventually would have returned to school to further his education, believing David "could have gone to college." John recalls David joining the Navy and returning home after graduating from boot camp. John believed David was happy serving in the Navy and remembers David reflecting that "that he hoped he makes his wife and his two sons, proud of him for what he's doing and all."

John recalls David being deployed to Beirut aboard the USS Iwo Jima as part of a "peacekeeping mission." John states that no one in the family was particularly apprehensive about the deployment and recalls last seeing his brother approximately three months prior to David's departure. During David's tour of Beirut, John received one letter from him in which David mentioned that his troops had taken on incoming sniper fire, yet still, David expressed no regrets for pursuing a naval career.

On the morning of October 23, 1983, John received a telephone call from his mother who informed him about the Beirut bombing. John remembers "there was a hot line to the Pentagon, where you could call 24 hours a day and you would speak to an officer there and they would upgrade you on any information they got about it." John believes, in the intervening two weeks between the day of the bombing and the day the military informed his parents of David's death, he called the hot line "thirty times."

The next memory John relates is of David's body being returned to the family "about a month and a half" after the bombing. David was interred at Arlington cemetery; John describes the casket as sealed – "very sealed."

John thinks often of his brother. He explained that he loved David "so much. And he was taken, you know, while he was so young and that's the thing, the bad thing about it," that David's kids were deprived of a father. John remembers David's death affecting his parents "very much." John visits David's grave at Arlington and attended a memorial service in Maryland.

## ANALYSIS

This court has repeatedly held defendants Islamic Republic of Iran and its Ministry of Information and Security legally responsible for providing material, financial and logistical support for the 1983 attack on United States servicemen in Beirut. *See, e.g., Peterson v. Islamic Republic of Iran*, 264 F.Supp. 2d 46, 61 (D.D.C. 2003) ("*Peterson I*"); *Valore v. Islamic Republic of Iran*, 478 F.Supp.2d 101, 110 (D.D.C. 2007); *O'Brien v. Islamic Republic of Iran*, 853 F.Supp.2d 44 (D.D.C. 2012). In addition to ascribing culpability, the courts have found Iran liable both to the victims and to their immediate family members for the mental anguish and loss of society they have suffered and continue to endure. *See Belkin v. Islamic Republic of Iran,* 667 F.Supp.2d 8 (D.D.C. 2009) ("Acts of terrorism are by their very definition are extreme and outrageous and intended to cause the highest degree of emotional distress.") (*citing Stethem v. Islamic Republic of Iran,* 201 F.Supp.2d 78, 89 (D.D.C. 2002)); *Heiser v. Islamic Republic of Iran,* 659 F.Supp.2d 20, 27 (D.D.C. 2009) ("[T]o collect for intentional infliction of emotional distress in cases such as this one, the plaintiff need not be present at the place of outrageous

conduct, but must be a member of the victim's immediate family") (citing *Jenco v. Islamic Republic of Iran,* 154 F.Supp.2d 27, 36 (D.D.C. 2001)).

To "obtain damages against defendants in an FSIA action, the plaintiff must prove that the consequences of the defendants' conduct were 'reasonably certain (i.e., more likely than not) to occur, and must prove the amount of the damages by a reasonable estimate consistent with this [Circuit's] application of the American rule on damages.'" *Estate of Brown v. Islamic Republic of Iran,* 872 F.Supp.2d 37, 41 (D.D.C. 2012) (citing *Salazar v. Islamic Republic of Iran,* 370 F.Supp.2d 105, 115–16 (D.D.C. 2005) (quoting *Hill v. Republic of Iraq,* 328 F.3d 680, 681 (D.C. Cir. 2003) (internal quotations omitted)). Upon consideration of the facts presented and in light of the aforementioned legal framework, the Special Master considers whether the following types of damages are available to David Worley's estate and his family members: pain and suffering, economic losses and solatium.

The Estate of David Worley

### a. Pain and Suffering

There was no testimony or evidence indicating that David Worley's death was anything but instantaneous. Unlike the evidence in *Eisenfeld, et al. v. Islamic Republic of Iran*, 172 F.Supp.2d 1 (D.D.C. 2000), where the Court awarded compensatory damages of $1,000,000 each for "several minutes" of pain and suffering of two decedents who died at the scene of the same bombing); or *Flatow v. Islamic Republic of Iran*, 999 F.Supp. 1 (D.D.C. 1998) ($1,000,000 for 3 to 5 hours of pain and suffering); or *Elahi v. Islamic Republic of Iran*, 124 F.Supp.2d 97 (D.D.C. 2000) ($1,000,000 for 3 or 4 minutes of pain and suffering), there is nothing in the record indicating that David Worley suffered prior to dying. To the contrary, the evidence suggests that he died immediately. Absent any evidence of suffering, the Special Master is constrained to

follow the principle that "'[i]f death was instantaneous there can be no recovery under such a statute for pain and suffering.'" *Elahi v. Islamic Republic of Iran*, 124 F.Supp.2d 97, 112 (D.D.C. 2000) (citation omitted).

### b. Economic Damages

28 U.S.C. § 1605A, like its statutory predecessor 28 U.S.C. § 1605(a)(7), establishes a cause of action for economic damages resulting from an act of state-sponsored terrorism. In this instance, in support of her demand for economic losses, Nancy Worley, administrator of David Worley's estate, submitted an Earnings Losses Report by Dr. Jerome Paige (attached as Exhibit C) – an acknowledged expert in the field of forensic economics. Dr. Paige provided detailed calculations as to David Worley's potential earnings over his life time based on two scenarios – the first, in which David retired after a military career and the second, in which David received no additional training after completing his tour of duty. The calculations were adjusted for inflation, rise in productivity, job advancement and personal consumption. The Special Master will rely upon Nancy Worley's testimony indicating that after retiring from the Navy after 20 years of service, David aspired to work in the medical field. The Special Master adopts Dr. Paige's corresponding lost earnings calculations and finds that the appropriate amount of economic losses of accretions to David Worley's estate, discounted to present value is $5,499,723.

<u>The Worley Family</u>

### c. Solatium Damages

Solatium damages are available to FSIA plaintiffs where extreme and outrageous conduct causes grief and anguish to those closely related to and impacted by a victim of terrorism. 28

U.S.C. §1605A(c)(4).  *See Surette v. Islamic Republic of Iran*, 231 F.Supp.2d 260, 269 n.8 (D.D.C. 2002) ("'[i]n an intentional homicide case such as [a terrorist killing], solatium appears in any event to be indistinguishable from the intentional infliction of emotional distress for which the District of Columbia does generally allow recovery in tort") (quoting *Wagner v. Islamic Republic of Iran,* 172 F.Supp.2d 128, 135, n. 11 (D.D.C. 2001)).  Spouses and relatives in direct lineal relationships are presumed to suffer damages for mental anguish insofar as "acts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress, literally, terror [.]" *Stethem*, 201 F.Supp.2d at 89.

That said, a claim for solatium, unlike one for lost wages, does not readily lend itself to quantification using "models and variable."  *Elahi v. Islamic Republic of Iran*, 124 F.Supp.2d 97, 111 (D.D.C. 2000) (*quoting Flatow v. Islamic Republic of Iran*, 999 F.Supp.2d 1, 32 (D.D.C. 1998)).  Courts look for guidance, therefore, in "prior decisions."

As the court articulated in *Heiser v. Islamic Republic of Iran*, the award framework for family members of deceased victims of terrorism is $8 million for spouses; $5 million for parents; $2.5 million for siblings and $3 million for children.  The generally accepted framework for compensatory awards for parents, spouses, siblings and children of surviving victims of terrorist attacks may be found in *Peterson II,* as reaffirmed in *Valore* and its progeny, where the court concluded that, "the appropriate amount of damages for family members of surviving servicemen are as follows: spouse ($4 million); parents ($2.5 million) and siblings ($1.25 million)," *Oveissi v. Islamic Republic of Iran*, 768 F.Supp.2d 16, 26 n. 10 (D.D.C. 2011), and $1.5 million for children.  *O'Brien*, 853 F.Supp.2d at 49.  *See also Anderson v. Islamic Republic of Iran*, 839 F.Supp.2d 263, 266 (D.D.C. 2012) ("in the context of distress resulting from injury to loved ones – rather than death – courts have applied a framework where "awards are 'valued

at half of the awards to family members of the deceased'—$4 million, $2.5 million and $1.25 million to spouses, parents, and siblings, respectively") (citations omitted).

These numbers, however, are "not set in stone," *Murphy v. Islamic Republic of Iran*, 740 F.Supp.2d 51, 79 (2010), nor are they artificial caps. They are but guidelines designed to promote uniformity in an area not readily receptive to quantification. Fluctuations in an upward direction, for example, may be warranted in those instances where the "evidence establish[es] an especially close relationship" or in the presence of "medical proof of severe pain, grief or suffering on behalf of the claimant" or where the "circumstances surrounding the terrorist attack [rendered] the suffering particularly more acute or agonizing." *Oveissi*, 768 F.Supp.2d at 26–27. Downward departures may be appropriate where evidence suggests that the relationship between the victim and his family members is attenuated. *See Valore v. Islamic Republic of Iran*, 700 F.Supp.2d 52, 86 (D.D.C. 2010).

The Special Master finds no special circumstances warranting a deviation from the framework set out above. While David Worley's widow, two sons and brother each testified to the emotional anguish they experienced in the aftermath of the Beirut bombing, nothing in the record demonstrates an "especially close relationship between the plaintiff and [victim], particularly in comparison to the normal interactions to be expected given the familial relationship," *Oveissi*, 768 F.Supp.2d at 27, which might compel an upward departure from the baseline award established in *Heiser*. The Special Master similarly finds no evidence suggesting a particularly tenuous or distant relationship that might compel a downward departure.

Accordingly, the Special Master makes the following recommendations: that Nancy Worley (wife) be awarded $8 Million Dollars ($8,000,000); that David Worley (son) be awarded Three Million Dollars ($3,000,000); that Bryan Worley (son) be awarded Three Million Dollars

($3,000,000); and that John Worley (sibling) be awarded Two Million Five Hundred Thousand Dollars ($2,500,000).

Dated:  September 22, 2015　　　　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　　　　　　　　By:  */s/ Alan L. Balaran*
　　　　　　　　　　　　　　　　　　　　　　　Alan L. Balaran, Esq.
　　　　　　　　　　　　　　　　　　　　　　　Special Master