UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
NANCY WORLEY, et al.,                    )
                                         )
    Plaintiffs,                          )
                                         )
v.                                       )   Case No.: 1:12-cv-02069 (RCL)
                                         )
THE ISLAMIC REPUBLIC OF IRAN, et al.,    )
                                         )
    Defendants.                          )
_____)

SUPPLEMENTAL REPORT OF SPECIAL MASTER
CONCERNING THE ESTATES OF
DAVID WORLEY AND JOHN BUCKMASTER

    On September 22, 2015, the Special Master filed the Report of Special Master Regarding Counts I - IV (David E. Worley) ("Worley Report") and the Report of Special Master Regarding Counts V – VIII (John B. Buckmaster) ("Buckmaster Report"). With respect to David Worley, the Special Master recommended that Worley's estate be awarded $5,499,723, as damages for lost accretions. Paige-Worley Report, at p. 14, ECF No. 46-3 (Exhibit A). The Special Master also recommended that the estate of John Buckmaster be awarded damages in the amount of $830,424. Buckmaster Report, at p. 12-13, ECF No. 47-3.

    On December 9, 2015, the Court issued a Memorandum and Order ("December 9 Order"), remanding the Worley and Buckmaster reports, directing the Special Master to develop a more complete factual record explaining the significant disparity between the two awards. December 9 Order, at p. 4. ECF No. 63.

    Background

    In recommending awards to the Worley and Buckmaster estates, the Special Master adopted the economic loss projections of Dr. Jerome Paige, "an expert on projected economic

losses in cases of wrongful death." *Holland v. Islamic Republic of Iran*, 496 F.Supp.2d 1, 3 (D.D.C. 2005). Dr. Paige has acted in a forensic capacity in numerous cases brought under the Foreign Sovereign Immunities Act.[1] His recommendations and conclusions have been accepted by this and other courts in this circuit for almost two decades.

The Special Master contacted Dr. Paige, explained the substance of the December 9 Order, and asked that he explain the basis for his loss projections – particularly for Worley given that the damages recommended by Dr. Paige appeared excessive when compared to those awarded similarly situated servicemen. Dr. Paige was unable to access the report he generated for Worley and asked the Special Master to transmit a copy for his review. The Special Master did so and subsequently made several attempts to contact Dr. Paige, both telephonically and via e-mail, to discuss the rationale underlying his projection of Worley's economic losses and to explain the disparity between his proposed damage award to Worley's estate and that indicated for Buckmaster. Dr. Paige responded to none of these communications and, to date, has provided the Special Master with no additional information or insight which might cast light on Worley's inflated economic loss projections. The Special Master was similarly unable to elicit the cooperation of Worley's counsel to intervene with Dr. Paige on the Special Master's behalf.

The Special Master is aware Dr. Paige derives much of the information which ultimately informs his economic loss projections from responses to a questionnaire he provides to counsel for each serviceman. The questionnaire is a one-page document captioned "Servicemen Information Needs" which asks for background information including the serviceman's age, date

---

[1] *See, e.g., Bennett v. Islamic Republic of Iran*, 507 F.Supp.2d 117, 128 (D.D.C. 2007) (Lamberth, J.); *Blais v. Islamic Republic of Iran*, 459 F.Supp.2d 40, 51 (D.D.C. 2006) (Lamberth, J.); *Holland*, *supra* (Kollar–Kotelly, J.); *Eisenfeld v Islamic Republic of Iran*, 172 F.Supp.2d 1, 8 (D.D.C. 2000) (Lamberth, J.); *Elahi v. Islamic Republic of Iran*, 124 F.Supp.2d 97, 110 (D.D.C. 2000) (Hens Green, J.); and *Flatow v. Islamic Republic of Iran*, 999 F.Supp. 1, 28 (D.D.C 1998) (Lamberth, J.).

of injury or death, highest level of education achieved and marital status.  The question of particular relevance to this analysis, is that seeking to elicit information concerning the serviceman's career aspirations.  Its significance to Dr. Paige's analysis is underscored by the following instruction:

> Here it is important to have as detailed description as possible of how long the person had planned to be in the military and as detailed a description as possible of the career the person would have liked to pursue after leaving the military.  Given the age of the person, most likely there would be years after 20, 25, or 30 years of service in the military and just as many years after the person would have left the military.

Exhibit B (Sample Questionnaire).

These questionnaires are not included in the packet of information provided to the Special Master as a matter of course and, in the past, the Special Master has had to specifically request they be produced to resolve any evidentiary discrepancies.  Here, again, the Special Master's request to secure the questionnaire for Worley was ignored.  The Special Master must therefore assume, in light of the magnitude of the projected economic loss, that, in response to the aforementioned question concerning Worley's career aspirations, counsel responded that Worley aspired to a military career as well as a career as a medical doctor.  It is clear that these aspirations constituted the central assumptions underlying Dr. Paige's analysis.  *See* Exhibit A, p. 1, line 23.

Given both Dr. Paige's and counsel's refusal either to provide the Worley questionnaire or to discuss other possible sources for these assumptions, the Special Master was compelled to examine Dr. Paige's methodology, scrutinize the record, determine whether there is any support for Dr. Paige's economic loss projections and, if necessary, propose a revised recommendation.

<u>Forensic Methodology</u>

Dr. Paige strives to supply an estimate that will best compensate injured and deceased servicemen (or their survivors) for the financial losses resulting from a terrorist attack such as the October 23, 1983 Beirut bombing. These estimates primarily focus on the losses associated with foregone employment opportunities and incorporate statistical averages, actuarial tables, and national data schedules. Dr. Paige then blends these averages, tables and schedules with the serviceman's personal data, such as "military training, educational aspirations, and occupational outlook data," *See* Exhibit C (Paige, Jerome S., PhD, Framework for Estimating Economic Loss (January 25, 2013) ("Economic Loss Framework")), to arrive at a fair estimate either of "economic loss" or, absent any employment history, of "loss of economic capacity" ("LOEC"). Each serviceman's particular information is then captured in Dr. Paige's economic report as "Key Facts and Assumptions" which, in turn, forms the linchpin of his recommended damage projections. Exhibit A, p.1, lines 7 through 29.

With these key facts and assumptions, Dr. Paige performs two separate series of calculations. *Id*. The first set of calculations is represented in the left-hand column of the economic report and "assumes the serviceman would initially pursue a military career," continue to earn as a civilian at the "age earnings rate," and eventually receive both a military and civilian retirement benefits ("Scenario 1"). Exhibit C, at p. 8. In Scenario 1, Dr. Paige assumed a 20-year military career followed immediately by a career as a licensed physician. Exhibit A, at p.1, lines 20-23.

The second set of calculations, represented by the right-hand column, assumes "an earning profile similar to someone with a high school education" ("Scenario 2"). Exhibit C, at p. 13. Dr. Paige refers to Scenario 2 as the "High School Scenario." Scenario 2 outlines "earnings as if [the serviceman] had not progressed beyond a high school degree," *id.*, at p. 6, and employs

a typical "mean earnings approach" for similarly-situated males "with the same level of education." *Id.*, at p.13

Dr. Paige then "discounts" the projected economic losses in both Scenario 1 and Scenario 2 to "present value," a process by which Dr. Paige ascribes a current worth to the future sum of money or stream of cash flow given a specified rate of return. *Id.*, at p.14.

Where a serviceman presents with an employment history, Dr. Paige is able to project "lost earnings" by gauging the "actual dollar value of money associated with a person being employed." *Id.*, at pp. 4 -5.  In *Elahi v. Islamic Republic of Iran*, 124 F.Supp.2d 97 (D.D.C. 2000), for example, Dr. Paige was able to calculate the economic losses for Cyrus Elahi, a 47-year old United States national killed in a terrorist attack in 1990, based on Mr. Elahi's past earnings as a former university professor and as a member of the Flag of Freedom Organization. *Id.* at 110.

Worley, like many of the servicemen killed or injured in Beirut, has no recorded pre-enlistment work history from which a "projected earning loss" may be determined.  Dr. Paige, therefore, calculated Worley's LOEC, factoring "some combination of educational attainment and employment opportunities . . . [and] by combining military training, educational aspirations, and occupational outlook data."  Exhibit C, at p. 5.

The Special Master has reviewed the record and finds it supports neither Dr. Paige's loss projections set out in Scenario 1 nor those calculated in Scenario 2. As such, the Special Master rejects Dr. Paige's initial projection that, immediately following his resignation from the Navy, Worley's annual salary would have increased from $40,674 to $133,098 nor Dr. Paige's projected discounted loss of economic capacity of $5,499,723.  Exhibit A, at p. 2, lines 28-29.

The Special Master further rejects Dr. Paige's projected damages of $2,210,627, as set out in Scenario 2.

<u>There is no Evidence Supporting Paige's Assumptions and Projected Loss of Economic Capacity in Scenario 1</u>.

As stated, Dr. Paige's LOEC projection of $5,499,723 assumes that Worley would first have embarked on a military career and then to a career as a licensed physician. There is nothing in the record supporting these suppositions as such an inference can be drawn only from a tortured interpretation of the testimony given by Nancy Worley, David Worley's widow,

During her deposition, Ms. Worley's initial testimony about her husband's career possibilities was captured in the following dialogue:

> Q. And after graduation [from boot camp] he received training to be a corpsman; is that correct --
>
> A. Yes.
>
> Q. --a hospital corpsman? Any specialization, surgical or medical training, any specialization that you can remember?
>
> A. Well, I don't know the -- about the training for the specialization, but I know he sent me pictures of him doing little minor surgeries, bloody and all, so I hope they trained him to do that before I got the photos --
>
> Q. Okay.
>
> A. -- you know.

Exhibit D, Tr. Nancy Worley, at p. 11, lines 14-22; p. 12, lines 1-4.

Later in the deposition, counsel again sought to elicit from Ms. Worley testimony about her husband's future medical career:

> Q. So it's your understanding that he wanted to stay in the Navy as a career?

> A. I know he did, yeah.
>
> Q. Okay.
>
> A. He wanted two careers. He wanted to stay for the 20 years and then have another career after that.
>
> Q. Go into the medical field?
>
> A. Yes, definitely.

*Id.*, at p. 14, lines 3-11.

Finally, counsel posed a third series of questions designed to hone further Ms. Worley's testimony concerning her husband's aspirations:

> Q. . . . . So it was your understanding that your husband, after he served his 20 years in the Navy, he wanted to go back to school and become a medical doctor, or --
>
> A. He wanted to get as much of that done as he could while he was still in --
>
> Q. Uh-huh.
>
> A. -- and then transition out, and he called it a second -- we talked about it extensively, so I know that's what he wanted to do.
>
> Q. Excellent.

*Id.*, at p. 17, lines 14-22 and p. 18, lines 1-2.

The Special Master finds this testimony a wholly inadequate basis upon which to rest Dr. Paige's projection of David Worley's economic losses. At no time during her deposition, did Ms. Worley independently proffer that her husband aspired to become a medical doctor. During the first round of questions, she was uncertain whether her husband sought training for "[a]ny specialization, surgical or medical training." Later in the deposition, Ms. Worley replied in the affirmative to the query whether her husband sought to go into the "medical field," which may

have included ambitions to be an emergency medical technician or hospital orderly.  Finally, in response to the specific question whether, after serving in the military for 20 years, Worley wanted "to go back to school and become a medical doctor," Nancy states, "he wanted to get as much of that done as he could while he was still in … and then transition out, and he called it a second — we talked about it extensively, so I know that's what he wanted to do."  This response, however, did not achieve its goal as it is unclear whether Ms. Worley was responding to a question concerning her husband's desire to stay in the military, to enroll in medical school after (or during) his service, or both.

In short, despite three separate attempts by counsel to elicit testimony that Worley aspired to be a medical doctor, Ms. Worley's testimony remains ambiguous.  What is not ambiguous, however, is that the phrases "medical training," "medical field," and "medical doctor" were not Ms. Worley's independent recollections.  They were the constructs of counsel.

The testimony of David Worley's older brother John casts a more cynical shadow over the supposition that David Worley was destined to become a physician.  When asked, for example, whether his brother "wanted to be in the medical profession," John responded: "No, um not really that one."  Exhibit E, Tr. John Worley, at p. 5, lines 11-16.  In response to a question concerning David Worley's intention to "start his own profession" once he left military service, John answered: "Uh, maybe."  *Id.*, at p. 6, line 11.  And when asked whether David ever expressed a desire to "be in the Navy for a career," John responded: "No, he did not really."  *Id.*, at p. 6, line 8.

In short, there is no evidence lending credence to the fundamental assumption which formed the basis of Dr. Paige's analysis that Worley would have been a medical doctor following a 20-year stint in the military.  The sparse testimony that did touch on Worley's career

aspirations is both ambiguous and contradictory and does not rise to the evidentiary level this Court has, in the past, deemed essential to ratify a damages award.

In *Blais v. Islamic Republic of Iran*, 459 F.Supp.2d 40 (D.D.C. 2006), for example, this Court was asked to rule on the appropriate economic losses accruing to United States airman Paul Blais, who was severely injured in a terrorist bombing while stationed in Saudi Arabia. Concluding that Blais would have become a commercial pilot had he not been maimed, this Court took note of the evidence that Mr. Blais "held a pilot's license and had amassed sufficient flying time to qualify for certification as a commercial pilot" and "was ready to take the commercial flying certification examinations." *Id.* at 47. The Court further credited the testimony indicating that Mr. Blais had always wanted to be an airline pilot, loved flying and joined the Air Force because of his love of flying. *Id.*

Similarly, in *Eisenfeld v Islamic Republic of Iran*, 172 F.Supp.2d 1 (D.D.C. 2000), this Court was asked to approve a damages award to Sara Rachel Duker and to Matthew Eisenfeld – both of whom were killed by a terrorist bomb while travelling to an archeological site in Israel. In its decision awarding damages, this Court expressly referenced both of their "outstanding academic careers," *id.*, at 8, citing evidence that Ms. Duker "was a graduate of Barnard College of Columbia University and was a student in a postgraduate program at the Hebrew University of Jerusalem beginning in the fall of 1995 and was so engaged at the time of her death" and that Matthew Eisenfeld "was a graduate of Yale University and was a student at the Jewish Theological Seminary at its facility in Israel beginning in the Fall of 1995 and was so engaged at the time of his death." *Id.*, at 4.

Unlike the claimants in *Blais* and *Eisenfeld,* Worley possessed no credentials which might reinforce the assumption that Worley aspired to, or would have, become a physician in the

projected time frame.  In other words, there is nothing in the record which could convince a trier of that, but for the tragedy in Beirut, Worley would have fulfilled Dr. Paige's prediction and become a licensed physician in 1997.

<u>Worley Would Have Been Unable to Emerge From the Military in 1997 as a Medical Doctor</u>.

Beyond the wholesale lack of evidentiary support for the assumptions underlying Dr. Paige's damages projections, there are independent reasons to reject the calculations set forth in Scenario 1.  The fact remains that, even if Worley did aspire to earn a medical degree while in service and earn a civilian physician's pay upon resigning from the Navy in 1996, those aspirations could not have been realized.

For Worley to resign from the military in 1996 and immediately embark on a career as a civilian physician in 1997, he would have needed a medical diploma.  The only avenue for him to have done so while serving in the military would have been to attend and graduate from the Uniformed Services University of the Health Sciences ("USU") – a university run by the U.S. federal government whose stated mission is "to educate, train and prepare uniformed services health professionals, officers and leaders to directly support the Military Health System, the National Security and National Defense Strategies of the United States and the readiness of our Armed Forces."  UNIFORMED SERVICES UNIVERSITY OF THE HEALTH SCIENCES, https://www.usuhs.edu/about/mission (last visited March 2, 2016).

At the time he enlisted, Worley received his GED or high-school equivalency diploma – having dropped out of high school in the ninth grade.  Exhibit E, Tr. John Worley, at p. 7, lines 11.  To be accepted into USU's medical degree program, Worley, first, would have had to apply to, be accepted by, and enroll in a degree program from a four-year accredited college or university where he would have been required to take one academic year of classes in general or

inorganic chemistry, physics, organic chemistry, biology writing-intense humanities, languages, social sciences or psychology and one semester of calculus or statistics. *See* Exhibit F (Requirements for Admission, USU), at 8. Worley would then have had to graduate with a 3.6 grade-point average – the average GPA of an admission class at USU – and subsequently pass the Medical College Admission Test with a score of 31.7 – five points higher than the national average. Only then could Worley have realistically expected to gain admittance to the medical degree program at USU. *Id.*, at 20.

Assuming his acceptance at USU, Worley would have had to undergo four years of medical training including an internship and residency and whatever additional classwork might be required should he have opted to specialize in any particular field of medicine. Once he successfully vaulted these hurdles, and the Special Master offers no opinion concerning his abilities to have done so, Worley would have had to pass the United States Medical Licensing Examination. At that point, Worley would have been expected to serve at least seven years on active duty and six years in the inactive ready reserve – receiving four years' credit toward military retirement.

Assuming Worley began this process in 1984, Worley could have expected approximately ten years of full-time education and a "minimum" of seven more years of active duty – placing him well beyond the 1996 deadline key to Dr. Paige's Scenario 1 calculations. As such, Dr. Paige's projection that Worley would have resigned from the Navy after 20 years of military service with a medical degree is not only fundamentally flawed, it is inconceivable.

Equally flawed is Dr. Paige's projection that, in 1997, Worley would have received pay commensurate with medical doctors in civilian life. Upon graduation from USU, Worley would have been promoted to the rank of O-3 (Lieutenant for Navy/Public Health Service). As

reflected in the attached chart, the rates of pay for medical officers at the rank of O-3 in 1997 – the year Dr. Paige projected Worley would embark on his career as a practicing physician – do not correlate to the income projections set out in Dr. Paige's schedules. *See* Exhibit G.

For these reasons, the Special Master rejects Dr. Paige's LOEC calculations for Worley, and finds the Scenario 1 projections entitled to no deference.

Dr. Paige's Scenario 2 Projections of Worley's LOEC Damages are Equally Flawed.

Rejecting Dr. Paige's Scenario 1 projections does not end the inquiry. For the reasons set out below, the Special Master is similarly unable to adopt Dr. Paige's alternative damages projection.

According to Dr. Paige, Scenario 2, as reflected in the right-hand column of his economic report "refer[s] to the scenario that assumes [the serviceman] would have had an earnings profile similar to someone with a high school education." Exhibit C, at p. 6. At least one court has characterized the calculations set out in Scenario 2 as grounded in "a plain-vanilla generic set of assumptions" which incorporates "Federal data collected by the U.S. Department of Labor, Bureau of Labor Statistics, and . . . a survey which is referred to as the current population survey." *Holland*, 496 F.Supp.2d at 33. Scenario 2 sets forth projections which rely on an admixture of factors including birth date, year of enlistment, date of death, military rank at time of death, highest achieved level of education, and base pay at time of death. As a "High School Scenario," the aspirational assumptions which inform Scenario 1 should not be in play. Yet, Dr. Paige projected that Worley, who was born in 1958, enlisted in the military in 1976, achieved the pay grade of E-4 with a base pay of $888.60[2], had a lost economic capacity of $2,210,627. This

---

[2] Dr. Paige's calculation of Worley's base pay in 1983 as $888.60 in incorrect. At the time of his death, Worley had served in the Navy for five years. According to the 1983 Military Base Pay Chart, Worley's monthly base pay, as an E-4 would have been $854.70. *See* Exhibit G.

Case 1:12-cv-02069-RCL   Document 69   Filed 03/18/16   Page 13 of 14

calculation, when compared to Dr. Paige's projections for other servicemen killed on October 23, 1983, cannot survive scrutiny.

Michael Mercer, for example, was born in 1955, enlisted in the military in 1976 and attended "some college." At the time of his death, Mr. Mercer achieved the rank of Sergeant at a grade of E-5 with a base monthly pay of $965.10. He was older than Worley, attended college, and was senior in pay grade and base pay. Yet, inexplicably, Dr. Paige projected Mercer's discounted LOEC, to be $1,300,655 – almost $900,000 less than Worley. Paul Hein, was born in 1960, attended "some college" and joined the military in 1974. At the time of his death in 1983, he achieved the rank of Major at an officer's grade of O-3 at a monthly base pay of $2,397.30. For Major Hein, Dr. Paige projected his discounted LOEC at $ 967,991 – more than $1,200,000 less than his projected economic loss to Worley under the "High School Scenario." Similarly, Dr. Paige's LOEC projections for Sergeant John Weyl, Gunnery Sergeant Dennis West and First Sergeant Tandy Wells each were approximately $1,000,000 less than Worley notwithstanding that, in 1983, each had more years in service, achieved superior ranks at higher pay grades and enjoyed base pays exceeding that received by Worley. *See* Exhibit H.

At minimum, Dr. Paige's loss projections for these servicemen calls into question the accuracy of his projections for Worley – especially as they rely ostensibly on little more than on "a plain-vanilla generic set of assumptions." *Holland*, 496 F.Supp.2d at 33. The Special Master is unable to reconcile these differences given Dr. Paige's refusal to assist the Special Master with his inquiries.

The Special Master is unwilling to adopt Dr. Paige's discounted LOEC projection set out in Scenario 2 and proposes to recommend a damages award based on a review of the record in this and similar cases. This proposal is not without support, as this jurisdiction long has

recognized that, "[a]ctuarial testimony as to possible or probable future earnings of the deceased, and the reduction of the aggregate amount to present worth," while admissible, is "*far from conclusive.*" *Thomas v. Potomac Elec. Power Co.*, 266 F.Supp. 687, 695 (D.D.C. 1967) (emphasis added.) The circumstances in this case prove the validity of this proposition. The errors uncovered here demonstrate that "[e]xpert economic testimony in a wrongful death case represents only a guideline and may not be adopted at its face value as the sole basis for the determination of damages for death." *Flythe v. District of Columbia*, 4 F.Supp.3d 222, 236 (D.D.C. 2014) (quoting *Thomas*, *supra*). And while several courts have found that discounting to present value "falls within the class of tasks which lend themselves to clarification by expert testimony because they involve the use of statistical techniques and require a broad knowledge of economics," *Schleier v. Kaiser Found. Health Plan of the Mid–Atl. States, Inc.*, 876 F.2d 174, 179 (D.C. Cir. 1989), "[n]ot every element of damages warrants the use of expert testimony, and the decision to admit expert testimony lies within the sound discretion of the trial court." *District of Columbia v. Barriteau*, 399 A.2d 563, 568 (D.C. 1979).

Accordingly, the Special Master has averaged the ages, ranks, pay grades of, and damages awarded to, dozens of servicemen killed in Beirut. Based on these calculations, the Special Master finds that the appropriate amount of economic losses of accretions to David Worley's estate is $950,000. The Special Master further recommend that no changes be made to the award previously recommended to the estate of John Buckmaster.

Dated: March 18, 2016                                                  Respectfully submitted,

By: */s/ Alan L. Balaran*
Alan L. Balaran, Esq.
Special Master